# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW MEXICO

M.G., a minor and through her mother
Christina Garcia; A.C., a minor, by and through
her mother Alicia Cortez.; C.V., a minor, by and
through his father Jeremy Vaughan.; and
Disability Rights New Mexico, Inc.

     *Plaintiffs,*

          v.

DAVID SCRASE, in his official capacity
as Secretary for the Human Services Department;
State of New Mexico HUMAN SERVICES
DEPARTMENT; PRESBYTERIAN HEALTH
PLAN, INC.; HCSC INSURANCE SERVICES
COMPANY operating as Blue Cross and Blue
Shield of New Mexico; and WESTERN SKY
COMMUNITY CARE, INC.

     *Defendants.*

Civ. Action No. 1:22-CV-00325-MV-GJF

**PLAINTIFFS' RESPONSE IN
OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

1

## I.     INTRODUCTION

Plaintiffs are qualified by the State's Medicaid program as "Medically Fragile Children," children who have "a life threatening condition characterized by reasonably frequent periods of acute exacerbation, which require frequent medical supervision or physician consultation and which, in the absence of such supervision or consultation, would require hospitalization." *See* 8.290.400.10 (C)(2)(a) NMAC.

This class action lawsuit seeks to enforce the rights of children with complex and often life-threatening medical conditions to receive medically necessary in-home nursing services (Private Duty Nursing) which have been approved and promised to them through New Mexico's Medicaid Program, Centennial Care 2.0.  Defendant New Mexico Human Services Department (hereinafter, "HSD") has contracted with three (3) managed care organizations ("MCOs"), Defendants Presbyterian Health Plan Inc., HCSC Insurance Services Company, and Western Sky Community Care Inc. (hereinafter, collectively referred to as "Defendants" or "Defendant MCOs") for the delivery of these nursing services. Defendants approved and authorized Plaintiffs' in-home nursing services. However, because Defendant MCOs are breaching their contractual promise with HSD to deliver these services, Plaintiffs and the entirety of the proposed class are not receiving the in-home nursing services they need to live safely within their communities.  As a result, these medically fragile children risk institutionalization and the deterioration of their health.

In their Complaint, Plaintiffs allege that Defendants have failed to deliver medically necessary nursing services.  Doc. 1, Class Action Complaint (Compl.), ¶¶ 1, 2, 8, 13-15, 36-37, 55-57, 99, 107-109, 111-113, 119, 126-133, 135-137, 139-140, 145-153, 155-156. Plaintiffs also allege they have a pre-established and existing legal right to -- and urgent need for -- these

services. *Id.* ¶¶ 3, 4-6, 10-11, 64, 72(?), 103-106, 110, 117-118, 121-122, 124-125, 140-142, 143-144, 154, 157-158, 160-175(?), 224-227, 234, 238-241, 245, 250-252, 257-258, 26.  Finally, Plaintiffs allege that pursuant to Defendants' contract with HSD, Defendants bear the risk of financial loss in exchange for a fixed per-member per-month payment from HSD. *Id.* ¶¶ 3, 8, 82, 8, 98, 177-186 (BCBS), 189-198 (Presbyterian), 201-210 (Western Sky), 213-220 (HSD).

In their Motion to Dismiss, Defendants do not challenge these factual allegations. Rather, Defendants jointly move to dismiss Plaintiffs' claims against them because they assert that Plaintiffs have no right to enforce Defendants' promise to deliver nursing services. To the contrary, the New Mexico Patient Protection Act of 1998 ("PPA"), NMSA 1978, §59A-57-1 et seq., allows Plaintiffs and the proposed class, as third party beneficiaries of the contract between Defendants and HSD, the statutory right to bring an action for breach of contract against Defendants.  For these reasons, the Court should deny Defendants' Motion to Dismiss.

## II.     BACKGROUND

Both the plain language of the PPA and the historical context of the PPA support its present day application to Plaintiffs' causes of actions against Defendants.  Plaintiffs therefore begin with a short description of the historical context.

In 1997, New Mexico transitioned its Medicaid program from a fee-for-service program to a managed care model, "in the interests of cutting costs." *Starko, Inc. v. Presbyterian Health Plan, Inc.,* 2012-NMCA-053, ¶ 4, *rev'd on other grounds sub nom. Starko, Inc. v. New Mexico Human Services Dept.,* 2014-NMSC-033, ¶ 4. "Under a managed care model, the State contracts with a private organization, an MCO, to deliver health care services to program participants for a fixed fee per person [and t]he MCO develops a network to deliver the required services by negotiating contracts with various medical service providers[.]" *Starko, Inc. v. New Mexico*

*Human Services Dept.,* 2014-NMSC-033, ¶ 10. Also, "[i]f the services provided by the MCO

cost more than the fixed fee provided by the State, the MCO bears the loss." *Id.*

     This model created significant incentives for the MCO to control its costs.  In turn,

consumers complained of decreased quality of health care and limitations in access to health

care. Ann H. Nevers, *ERISA Right to Sue: An Rx for Health Care That Places Forum over*

*Substantive Consumer Rights*, 31 N.M.L. Rev. 493 (2001). For example, after the switch to

managed care, the screening rate of children enrolled in Medicaid for services, pursuant to the

Early Periodic Screening Diagnosis and Treatment (EPSDT) mandate, dropped. *See* 42 U.S.C.A.

§ 1396d(r) (describing EPSDT). In 1996 only 40% of children in enrolled in New Mexico's

Medicaid program were screened for services and that number dropped to less than 23% with the

implementation of managed care in 1998. *See* April Land, *Dead to Rights: A Father's Struggle to*

*Secure Mental Health Services for His Son*, 10 Geo. J. on Poverty L. & Pol'y 279, 304 (2003).

     As consumers sought redress for the limitations and decline in quality health care, they

were met with further barriers to relief.  *See* Nevers, *ERISA Right to Sue, supra,* at 493.

Numerous states began enacting right to sue legislation, and in 2000, "seventeen states were

considering whether to expand liability for managed care health plans [], according to an annual

survey by the Blue Cross and Blue Shield Association." *Id.* at 525.

     In 1998, New Mexico's Legislative Finance Committee recognized consumer access to

care as a "significant issue" surrounding the PPA. The Committee wrote: "Nationally concerns

have been raised regarding Managed Care Providers limiting access to health care and imposing

barriers in traditional physician/patient relations."[1]  The New Mexico Legislative Council

Service noted, "Consumer interests were in the forefront of various health issues" and "[i]n the

_____

[1]*See* Exhibit 1, attached, 1998 Fiscal Impact Report, House Bill 361, New Mexico Legislative Finance
Committee (February 6, 1998).

vanguard was the Patient Protection Act[.]" [2]  It further noted "the legislation applies to coverage offered by all managed care organization, including private managed care plans, those plans providing coverage to Medicaid clients and those offered to public employees." [3] Notably, the Legislative Finance Committee affirmed that "[t]he act would apply to the Medicaid Program." *See* Exhibit 1 at 1.

The PPA established, among other things, "private remedies to enforce patient and provider insurance rights; enrollee as third-party beneficiary to enforce rights" based on contract theory. *See* § 59A-57-9; *see also* Nevers, *ERISA Right to Sue, supra,* at 522 (quoting PPA, § 9A-57-9).

> It also provides for an injunction as needed and provides for awards to class members in class action lawsuits. The statute indicates that the relief provided by statute is in addition to remedies available at common law or through other statutes of the state. New Mexico is unique in that it does not combine the right to sue provisions with external review processes.

*Id.* (citing PPA, § 59A-57-9 (B), (D), (E).) Significantly, as previously signaled by the Legislative Finance Committee, the statute expressly provides that "the provisions of the Patient Protection Act *apply to the Medicaid program operation* in the state." *See* § 59A-57-10(A).[4]

In support of their Motion to Dismiss, Defendants maintain that "Medicaid enrollees in traditional managed care arrangements do not need third-party beneficiary rights to vindicate their coverage rights."  Doc. 21, Joint Motion to Dismiss Plaintiffs' Claims Against Presbyterian Health Plan, Inc., HCSC Insurance Services Company, and

---

[2] *See* Exhibit 2, attached, Highlights of the Forty-Third Legislature Second Session and First Special Session, New Mexico Legislative Council Service, page 15.

[3] *Id*. at page 16

[4] Because the federal government is not a party to this contract and the place of contract is the State of New Mexico, the applicable law in construing the meaning and validity of this Contract is state law. See *Tucker v. R.A. Hanson Co., Inc*., 956 F.2d 215, 217 (10th Cir. 1992). Doc. 1, Compl. ¶ 162; *see also* Doc. 21-1 at 337, §7.10. ("This Agreement shall be governed by the statutes of the State of New Mexico.").

Western Sky Community Care, Inc. (Motion) at 9. This is a fight Defendants lost in 1998, with the passage of the PPA.  Regardless of Defendants' opinion, the New Mexico Legislature has made clear in both the plain language of the PPA and its legislative history that Defendants are mistaken.

### III.    STANDARD OF REVIEW

Defendant MCOs state that they move to dismiss under Rules 12(b)(1) and 12(b)(6), "out of an abundance of caution."  Doc. 21, Motion at 4 n.5.  But as their motion itself demonstrates, only the Rule 12(b)(6) standard applies.

Under both Rule 12(b)(1) and Rule 12(b)(6), "[the Court] accept[s] as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff." *Garling v. United States Envtl. Prot. Agency*, 849 F.3d 1289, 1292 (10th Cir. 2017). However, "[t]he distinction between Rules 12(b)(1) and 12(b)(6) is important because the 12(b)(6) standard affords significantly more protections to a nonmovant." *See e.g., Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.,* 836 F.3d 261, 268 (3d Cir. 2016). This is because a 12(b)(1) motion allows Defendants to present, and for the Court to consider, competing facts outside of the Complaint. *Id*. By generally alleging dismissal on both grounds for all causes of action, the Court and Plaintiffs would face the task of determining whether Defendant MCOs are permitted to present competing facts under 12(b)(1), as they well do, or if the Court is required to disregard Defendants' competing facts while maintaining the allegations in the Complaint as true under 12(b)(6). The Tenth Circuit, however, is well settled on the required approach:

> Where, however, the court determines that jurisdictional issues raised in a
> rule 12(b)(1) motion are intertwined with the case's merits, the court should
> resolve the motion under either rule 12(b)(6) or rule 56. "When deciding whether
> jurisdiction is intertwined with the merits of a particular dispute, 'the underlying
> issue is whether resolution of the jurisdictional question requires resolution of an
> aspect of the substantive claim.'"

*World Fuel Services, Inc. v. Nambe Pueblo Dev. Corp.,* 362 F. Supp. 3d 1021, 1055 (D.N.M. 2019) (internal citations omitted).

Furthermore,

> Under Tenth Circuit law, "[w]hen subject matter jurisdiction is dependent upon the same statute which provides the substantive claim in the case," and where "the resolution of the jurisdictional question requires resolution of an aspect of the substantive claim," the jurisdictional issue and the merits are considered intertwined.

*Harter v. United States*, 344 F. Supp. 3d 1269, 1274 (D. Kan. 2018) (internal citations omitted).

As Defendants concede, subject matter jurisdiction for Plaintiff's First Cause of Action for declaratory judgment depends largely on whether Section 59A-57-9(C) of the PPA confers the substantive right of action for Plaintiffs to enforce Defendants' contracts with HSD. *See* Doc. 21, Motion at 4. Accordingly, resolution of Defendants' question of whether Plaintiffs have standing as third party beneficiaries with enforcement rights requires resolution of Plaintiffs' declaratory judgment claim that the Defendant MCOs' contractual provision disclaiming third-party beneficiary rights is unlawful under Section 59A-57-9(C). *See* Doc. 1, Compl. ¶¶ 159-179.

In their motion, Defendants do not make a specific challenge to constitutional standing, but rather to Plaintiffs' statutory standing under the PPA. "[S]tatutory standing is not jurisdictional." *See Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1249 (10th Cir. 2021). Statutory standing is not a jurisdictional issue appropriate for a 12(b)(1) motion. Even if it were a jurisdictional challenge, Defendants' challenge would still rest on the same statute which provides for Plaintiffs substantive claim of declaratory judgment, and in turn the following claims of breach of contract. Accordingly, Defendants' motion is solely a 12(b)(6) motion.

## IV.    ARGUMENT

### A.  Plaintiffs Are Third-Party Beneficiaries to Defendants' Contract with HSD for the Provision of Services to Plaintiffs.

The heart of Defendant MCOs' motion is their position that Plaintiffs are not third-party beneficiaries of their contract to provide services to Plaintiffs. This position is untenable. Plaintiffs are qualified as "enrollee[s] participating in or eligible to participate in a managed health care plan in a managed care health plan," and are therefore third-party beneficiaries pursuant to New Mexico statute.  *See* NMSA 1978, § 59A-57-9(C).

Notwithstanding the clear statutory language, Defendants argue "the PPA does not authorize third-party enforcement of managed care agreements that are part of the State's Medicaid program." Mot. to Dismiss. 4. However, the statute is quite clear that "[a] managed health care plan offered through the medicaid program shall grant enrollees and providers the same rights and protections as are granted to enrollees and providers in any other managed health care plan subject to the provisions of the Patient Protection Act." NMSA 1978, § 59A-57-10(A). Also, Defendants neglect to mention that "any rights established under [the Patient Protection Act] *beyond those under requirements of the human services department* **shall** apply to enrollees in medicaid managed health care plans." NMSA 1978, § 59A-57-10(D) (emphasis added). Accordingly, Medicaid enrollees in managed care share at least the same rights as those in the private market, including the right of contract enforcement as third-party beneficiaries. *See* NMSA 1978, § 59A-57-9 (1998) (aptly titled "**Private remedies to enforce patient and provider insurance rights; enrollee as third-party beneficiary to enforce rights**").[5]

---

[5] While the purpose of the PPA serves to specify the rights of managed care enrollees, the public policy underpinning the PPA is that "insurance protections should ensure that managed health care plans treat patients fairly and arrange for the delivery of good quality services." NMSA § 59A-57-2. Allowing Medicaid beneficiaries to enforce the MCO/HSD contract supports this policy to ensure the delivery of promised medically necessary services— aligning with the private enforcement provision in NMSA § 59A-57-9. *Starko, supra.*, at ¶33(internal

**B. HSD's Authority to Administer Medicaid Is Not Compromised by Plaintiffs' Cause of Action Against MCO Defendants.**

Both Plaintiffs and Defendants acknowledge that HSD has authority to administer the State Medicaid program, and that the State must act consistently with the federal Medicaid Act. However, "[t]aken as a whole, these references to consistency merely recognize that HSD acts with the federal government to cooperatively administer certain public assistance programs such as . . . Medicaid. Such 'boilerplate' language recognizing the cooperative nature of the federal and state relationship cannot be used to justify the unfettered discretionary authority that [Defendants] urge.  Nor can this language be used to ignore the substantive commands of the New Mexico Legislature." *State ex rel. Taylor v. Johnson*, 1998-NMSC-015, ¶ 35, 125 N.M. 343, 352, 961 P.2d 768, 777.  In the absence of an explicit bar in the federal Medicaid Act, HSD's general authority to manage Medicaid does not authorize HSD to set aside the state statutory mandate in the PPA.   "The administrative agency's discretion may not justify altering, modifying or extending the reach of a law created by the Legislature." *Id.* at ¶ 22.

Defendant MCOs assert that Plaintiffs are claiming to be "entitled to more expansive Medicaid benefits than the Defendants have provided them." Doc. 21, Motion at 6-7.  To the contrary, Plaintiffs claim Defendants broke their promise to deliver medically necessary nursing services which they had agreed to provide. Doc. 1, Compl. ¶11.  Defendants point to nowhere in the Complaint where Plaintiffs seek "more expansive Medicaid benefits," citing instead to paragraphs 144-146 of the Complaint to support their assertion. Doc. 21, Motion at 7. However, these paragraphs allege that Plaintiff M.G. was only able to access a fraction of the total nursing hours *already approved* by Defendant Western Sky, not that she was entitled to more than what

---

citations omitted) (in absence of express mechanism for statute's enforcement, courts examine whether cause of action may be implied through common law based on legislative intent or public policy).

was approved as medically necessary. Doc. 1, Compl. ¶¶ 144- 146. Plaintiffs' already approved Medicaid benefits is distinct from Defendants' failure to provide services owed.[6]  The former is Defendants' existing contractual duty; the second is Defendants' breach of their contractual duty.

Defendants nevertheless assert that Plaintiffs are seeking to "enforce . . . the scope [and] definitions . . . of Medicaid benefits" which they claim are reserved to the discretion of HSD. Doc. 21, Motion at 7. This is a straw man.  Plaintiffs are not seeking to enforce the scope and definitions of benefits; indeed, Plaintiffs accept the established scope and definition of the services to which they are entitled, that is, medically necessary private duty nursing hours. Importantly, Defendants nowhere challenge that they determined Plaintiffs to be entitled to the private duty nursing hours at issue in Plaintiffs' Complaint.  Nor could they in their present Motion to Dismiss, where such a challenge involves a dispute of fact. Again, Plaintiffs merely seek to enforce Defendants' promise to deliver those nursing hours already approved as medically necessary, a promise they have breached.  Doc. 1, Compl. ¶98.

Defendants cite to *Prince George's Hosp. Ctr. v. Advantage Healthplan Inc.*, 985 F. Supp. 2d 38, 50 (D.D.C. 2013) to say that only states, and not third parties, are permitted to enforce MCO compliance with a state's Medicaid program.[7] Doc. 21, Motion at 7.  However, in

---

[6] Defendants have elsewhere made similar arguments about what Plaintiffs are *not* alleging rather than focusing on what they *are* alleging.  *See* Doc. 43, Managed Care Organization Defendants' Joint Opposition to Plaintiffs' Motion to Permit Discovery at 8, n. 6 (stating Plaintiffs have *not* alleged they were denied "authorization for any Private Duty Nursing ("PDN") services recommended for Plaintiffs in their Care Coordination Plans" nor that they were denied "payment for any claims presented to [MCO Defendant] for any PDN services performed for Plaintiffs."

[7]*Contra cf. JL v. New Mexico Dep't of Health*, 165 F. Supp. 3d 1048, 1064 (D.N.M. 2016) (Martha Vázquez, J.) ("1396a(a)(8) and (3) create privately enforceable rights."); *Planned Parenthood of Kansas v. Andersen*, 882 F.3d 1205 (10th Cir. 2018) (free-choice of provider provision of the Medicaid Act privately enforceable); *Wilder v. Virginia Hospital Association* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (holding that Section 1396a(a)(13)(A) is privately enforceable by providers); *Bryson v. Shumway*, 308 F.3d 79 (1st Cir. 2002) (reasonable promptness provision of Medicaid Act was enforceable provision); *Davis v. Shah*, 821 F.3d 231 (2d Cir. 2016) (home health services provision of the Medicaid Act was enforceable); *Sabree ex rel Sabree v. Richman*, 367 F.3d 180 (3d Cir. 2004) (reasonably prompt provision of intermediate care facilities for eligible Medicaid recipients was enforceable); *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204 (4th Cir. 2007) (holding providers for eligible Medicaid recipients had right to enforce reimbursement rights under the Medicaid Act); *S.D.*

*Prince George's Hospital,* the court addressed only the limited point that a plaintiff does not have an implied right to enforce a contractual provision that has been adopted directly from a Medicaid statute.  Plaintiffs in the instant case do not seek an implied right to action to enforce implied right of action to enforce any contractual provision adopted directly from the Medicaid Act.

Thus *Prince George's Hospital* involved a health care provider seeking to enforce a contractual provision of the MCO's contract which mirrored the requirements of a Medicaid statute. 985 F. Supp. 2d 38, 47–48.  This is distinct from the present case, where the third-party disclaimer does not mirror a Medicaid provision.  The court in *Prince George's Hospital* narrowly held that it would frustrate the intent of Congress to allow enforcement of the *specific* Medicaid related contractual provision, because the contract did not otherwise provide for a right of action. *Id.*  The court did *not* address whether the federal Medicaid Act otherwise prohibited third party beneficiary status derived from a specific state statute such as the PPA.  Indeed, even Defendants do not assert that the court in *Prince George's Hospital* held that a disclaimer of third party rights is either sanctioned or required by the federal government. *See* Doc. 21, Motion at 8.  In contrast to the facts in *Prince George's Hospital,* New Mexico provides a private right of action for third-party beneficiaries in the PPA, Section 59A-57-9(C), and explicitly applies the PPA to Medicaid beneficiaries. The court in Prince George's Hospital therefore was not required to address and did not address the scenario now before this Court.

---

*ex rel. Dickson v. Hood*, 391 F.3d 581 (5th Cir. 2004) (recipient could enforce provision of Medicaid Act requiring medical assistance to cover eligible supplies); *Waskul v. Washtenaw County Community Mental Health*, 979 F.3d 426 (6th Cir. 2020) (recipients could enforce provision in Medicaid Act requiring necessary safeguards to protect the health and welfare of individuals and to assure financial accountability); *Center for Special Needs Trust Admin., Inc. v. Olson*, 676 F.3d 688 (8th Cir. 2012) (plaintiffs could enforce Medicaid Act's pooled trust provision); *Ball v. Rodgers*, 492 F.3d 1094 (9th Cir. 2007) (recipients could enforce free choice provisions under the Medicaid Act).

Rather than confronting head on the distinguishing facts in *Prince George's Hospital,* Defendants stretch the significance of the case beyond its narrow facts. Thus they jump to the conclusion that HSD requires the disclaimer of third-party rights to discourage beneficiaries from "prioritizing their own interests" ahead of others. *Id.* Indeed, Defendants re-label Plaintiffs as mere "private parties." Of course, HSD's intent in drafting the contract is a factual dispute. But more importantly, HSD's intent is irrelevant – HSD cannot rely on private contractual fiat to set aside the PPA mandate that establishes Plaintiffs' third party beneficiary rights. *See State ex rel. Udall v. Colonial Penn Ins. Co*., 1991-NMSC-048, ¶ 30 ("A contract incorporates the relevant law, whether or not it is referred to in the agreement."). In the absence of explicit language in the Medicaid Act *prohibiting* third party beneficiary status, the parties' *preference* to exclude third party beneficiaries is preempted by the PPA.

Ultimately, Defendants argue that allowing beneficiaries to enforce the contract is "interfering with [HSD's] authority to administer Medicaid." *Id.* The Seventh Circuit Court of Appeals in *O.B. v. Norwood* saw it much differently when it allowed similarly situated medically fragile children to enforce their right to in-home nursing services. 838 F.3d 837 (7th Cir. 2016). There, the court found that "plaintiffs aren't asking for a guarantee [that enough nurses will be available]; they're asking for the nurses, and there is no indication that [Defendants] will (unless compelled by the courts) lift a finger to find nurses to provide home nursing for children in [Plaintiffs'] situation." *Id. at* 841–42 (7th Cir. 2016) (affirming preliminary injunction against state for the denial of in-home nursing services for child Medicaid beneficiaries).

Not only is this argument inaccurate, asserting *the interests of HSD* to administer the state Medicaid program is not a basis to dismiss claims for *the MCO Defendants' breach of their contractual obligations* to both HSD and Plaintiffs. Because Defendants fail to show how the

third party disclaimer falls within the limits of HSD's general authority to manage Medicaid benefits, and because third-party beneficiary enforcement is conferred by statute, Defendants' argument is deficient and their motion should be denied on these grounds.

Next, Defendants argue that Plaintiffs somehow seek to "usurp HSD's enforcement discretion." Doc. 21, Motion at 8. Defendants object that in their fifth count, Plaintiffs allege that HSD also breached the Managed Care Agreement by failing to take enforcement action against the MCO Defendants. Thus, Defendants' argument goes, Plaintiffs are attempting to deprive HSD of the enforcement discretion granted to it by federal law. *Id.*

Plaintiffs' claims against MCO Defendants do nothing to prevent HSD from issuing notices of breach to Defendants according to its obligation. See Doc. 1, Compl. ¶¶ 216-218. Plaintiffs' claims, therefore, do not "usurp HSD's enforcement discretion."

To the contrary, the PPA is designed to enhance enforcement power, not usurp enforcement discretion. HSD's failure to act to enforce Plaintiffs' right to care is precisely the reason third party beneficiary status must play a critical role in assuring accountability in the implementation of agreements between States and MCO's. HSD has the discretion, even now, to bring its own enforcement action; it does not have any discretion to prohibit Plaintiffs from enforcing their own third party beneficiary rights. Indeed, as Plaintiffs have already described, the imbalance of power created by the power of MCO's to grant or deny services is what led the New Mexico legislature to enact the PPA.

Because Plaintiffs' claims do not compromise HSD's concurrent authority to enforce the agreements, Defendants' Motion to Dismiss should be denied.

### C. The Administrative Appeals Process Does Not Apply to this Case.

Defendants confuse Plaintiffs' breach of contract action by conflating coverage benefits following an adverse decision in a health plan with contract enforcement rights to sue as a third party beneficiary. Doc. 21, Motion at 8.  The New Mexico Legislature has made a clear distinction under the PPA. In a private market, the appeal of an adverse decision goes to the superintendent of insurance per Section 59A-57-4.1; in Medicaid, it goes to HSD per Section 59A -57-10. These appeals are pursuant to the Public Assistance Appeals Act, to which Defendants refer. *See* NMSA 1978, § 27-3-1 et seq. However, the Public Assistance Appeals Act provides for appeals of administrative agency benefit decisions, and does not authorize class action monetary damages nor injunctive relief, which Plaintiffs seek. *See id.;* § 59A-57-4.1; §59A -57-10. In contrast, the PPA expressly provides that for private causes of action based on contract theory, *in addition to administrative remedies:* "[t]he relief provided pursuant to this section is *in addition to other remedies available* against the same conduct under the common law or other statutes of this state." Section 59A-57-9 (emphasis added).

Defendants nevertheless assert as a factual matter that Plaintiffs have not availed themselves of the administrative appeals process. Doc. 21, Motion at 9, n.7.  Again, Defendants are not only raising a factual dispute in a 12(b)(6) motion, but their facts are wrong.

As Defendants are aware, the appeals process does not begin until HSD or Defendants issue a "notice of adverse action" which then triggers the appeals timeline. *See* NMAC 8.308.15.14 (A) ("A member… has the right to request within 60 calendar days after the mailing of the MCO's notice of action a MCO standard member appeal orally and in writing").

Defendants have failed to issue such notices, and have failed to do so for years in some cases.[8] Thus, the process advanced by Defendants has proven not to be "faster and less expensive than litigation" addressing their systemic failure to provide nursing services. *See* Doc. 21, Motion at 9; *Franco v. Carlsbad Municipal Schools*, 2001-NMCA-042, ¶ 20 (holding that administrative remedies inadequate when the agency's failure to meaningfully inform an employee of those remedies thwarted the employee's ability to invoke them); *see also Urban by Urban v. Jefferson Cnty. Sch. Dist. R-1*, 89 F.3d 720, 725 (10th Cir. 1996) ("Administrative remedies are generally futile or inadequate when plaintiffs allege structural or systemic failure and seek systemwide reforms.").

Defendants' actual response to Plaintiffs' efforts to seek such a remedy underscores the inadequacy of the administrative process to remedy their failures. The complaint states that each of the named Plaintiffs submitted a demand to their respective MCO to satisfy the approved PDN hours. (Doc. 1, Compl. ¶¶ 108, 131, 146-149). These demands put Defendants on notice that Plaintiffs were not receiving medically necessary services. Members have a right to request MCO appeals within 60 calendar days of the "date of the notice of an intended or taken adverse action." 8.308.15.11(B)(4) NMAC; *see also* 8.308.15.13(A) NMAC.[9] Grievances, unlike MCO member appeals, "cannot be appealed through the MCO member appeal process or the HSD administrative hearing process." 8.308.15.11(B)(3) NMAC. Defendant MCOs have yet to provide Plaintiffs with required notices of adverse benefit determinations, the action which invokes the administrative appeals process, yet assert that Plaintiffs themselves have failed to

---

[8]Doc. 1, Compl. ¶¶ 106-107 (Plaintiff A.C. facing shortfall of services since March 12, 2020); ¶129 (Plaintiff C.V. facing nursing shortfall on June, 30, 2020); ¶¶ 144-145(Plaintiff M.G. faced a shortfall since April 26, 2021).

[9]Adverse benefit determinations include the failure of the Managed Care Organization to provide medically necessary and approved services. *See* 8.308.15.7(B)(1)(d)(ii) NMAC.

avail themselves of that process. To the extent Defendants assert a position to the contrary, they are again raising a dispute of fact. Moreover, while these facts are disputed, ultimately they are also beside the point.

Section 59A-57-9 does not state that an aggrieved party must exhaust administrative appeals. To the contrary, the statute expressly provides that its remedies are "in addition to other remedies available against the same conduct under the common law or other statutes of this state." NMSA 1978, § 59A-57-9. The legislature did not intend for administrative Medicaid appeals to be exclusive. *See Herald v. Bd. of Regents of Univ. of New Mexico*, 2015-NMCA-104, ¶ 25 (finding language in New Mexico's Whistleblower Protection Act to be permissive as it states its remedies "shall be in addition to any other remedies provided for in any other law" and legislative silence on exclusivity of remedies); *see also Randall v. New Mexico*, 2014 WL 12796819, at *6 (D.N.M. Apr. 30, 2014) (Magistrate Judge C. Garza, sitting as District Court Judge) (exhaustion of remedies not required where the "statute contains no explicit requirement that a plaintiff first exhaust her administrative remedies, and specifically allows for [Plaintiff] to bring an action[.]"). Also, Defendants "offer no explanation as to why the Legislature would feel compelled to pass a statute that's primary function [] appears to be making explicit protections that already exist." *Id*. Rather, because Medicaid beneficiaries have "the same rights and protections as are granted to enrollees [] in any other managed health care plan [,]" as in Section 59A-57-10(A), Medicaid beneficiaries also have the right to a private cause of action concerning the MCO contract under Section 59A-57-9(C). Therefore, a congruent reading of the statute is that *anyone* under a managed care plan has the right both to appeal adverse decisions and to bring third party beneficiary contract claims.

### D.  Plaintiffs' First Cause of Action Seeking Declaratory Relief Is Neither Duplicative nor Collateral to the Complaint.

Defendants confuse Plaintiffs' First Cause of Action (Doc. 1, Compl. ¶¶159-75, 267) with the declaratory relief requested in relation to other counts (Doc. 1, Compl. ¶¶268-9). Plaintiff's First Cause of Action, brought pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201(a), centers *solely* on Section 7.12.2 of the Contract, which disclaims the enforcement rights of third party beneficiaries (Doc. 1, Compl. ¶¶161,163-4).  It alleges that Section 7.12.2 contravenes both statutory law and public policy (Doc. 1, Compl. ¶¶165, 167), is illegal and unenforceable (Doc. 1, Compl. ¶¶166, 174), and is made without contractual authority on the part of HSD (Doc. 1, Compl. ¶¶168-73).  The relief requested for this First Cause of Action is set out in Doc. 1, Compl. ¶267, in which Plaintiffs ask the Court to "[d]eclare unlawful the provision of Defendants' Medicaid Managed Care Services agreement disclaiming third-party beneficiary enforcement rights."  Because the cause of action simply asks the Court to declare that Defendants' disclaimer of third-party beneficiary rights is unlawful (Doc. 1, Compl. ¶¶159-75, 267), Defendants are mistaken in their reading of the cause to seek declaration of third party status and a declaration of Defendants' breach of contract. Doc. 21, Motion at 12.

Regardless, Defendants cite to cases that are inapposite to the present case. For instance, Defendants misapply *Calderon v. Ashmus*, 523 U.S. 740, 747, 111 S. CT. 1694, 140 L.Ed. 2d 970 (1998) to assert Plaintiffs' declaratory judgment action seeks to determine a collateral issue. Doc. 21, Motion at 12-13.  In *Calderon,* a California state prisoner sought to bring a class action establishing that the State had not satisfied the conditions to qualify for certain procedural advantages in federal habeas litigation provided by the Antiterrorism and Effective Death Penalty Act of 1996. The Court held that the underlying controversy "is whether [the prisoner] is entitled to federal habeas relief setting aside his sentence or conviction obtained in the California

courts." *Calderon,* 523 U.S. at 746, 118 S.Ct. 1694.  Since the determination of this issue was

not sought in the case, there was no controversy, but instead a piecemeal declaration of law. *Id.*

This case stands for the proposition that a declaratory judgment action on a single issue is

improper, *without* identifying a specific claim or potential claim because "[a]ny judgment in

[the] action thus would not resolve the *entire* case or controversy as to any one of them, but

would merely determine a collateral legal issue governing certain aspects of their pending or

future suits." *Id*. at 747, 118 S.Ct. 1694 (emphasis added). Further, the Court stated that the case

before it "illustrates *the need ... to prevent federal-court litigants from seeking by declaratory

judgment to litigate a single issue in a dispute that must await another lawsuit for complete

resolution.*" *Id.* at 748, 118 S.Ct. 1694 (emphasis added).

      Here, Plaintiffs do not seek declaratory judgment on a single issue that must wait on

another lawsuit for complete resolution. Rather, they bring a breach of contract claim for

damages *in addition to* a declaratory judgment claim. Plaintiffs are not seeking an advanced

ruling on a collateral issue because all issues necessary to afford relief are present as separate

claims in a single action, *i.e.,* declaration of unlawfulness of third-party disclaimer and third-

party enforcement of contract. The certainty of the unlawfulness of the third party disclaimer is

needed to show Plaintiffs are entitled to relief on their breach of contract claim. "The contingent

nature of the right or obligation in controversy will not bar a litigant from seeking declaratory

relief when the circumstances reveal a need for a present adjudication." *Allendale Mut. Ins. Co.

v. Kaiser Eng'rs,* 804 F.2d 592 (10th Cir.1986), *cert. denied,* 482 U.S. 914, 107 S.Ct. 3185, 96

L.Ed.2d 674 (1987). Accordingly, Plaintiffs' Declaratory Judgment Act claim satisfies the

purpose of "terminat[ing] or afford[ing] relief from the uncertainty giving rise to the

proceeding." *Kunkel v. Continental Cas. Co.*, 866 F.2d 1269, 1275 (10th Cir. 1989).

Defendants cite *TBL Collectibles, Inc. v. Owners Ins. Co.*, 285 F. Supp. 3d 1170, 1195 (D. Colo. 2018) to argue for dismissal "where a plaintiff seeks declaratory relief that would resolve the same issues raised by other claims brought in the same action." However, the unlawfulness of the third-party disclaimer in this case is distinct from whether Plaintiffs *are* third party beneficiaries (conferred by statute) and whether Defendants breached their contract with the State.  *See* Third Party Beneficiary claims for Breach of state Medicaid Managed Care Service Agreement, against Defendants BCBSNM (Second Cause of Action, Doc. 1, Compl. ¶¶176-187), Presbyterian (Third Cause of Action, Doc. 1, Compl. ¶¶188-199), and Western Sky (Fourth Cause of Action, Doc. 1, Compl. ¶¶200-211). *TBL Collectibles* does not advance Defendants' argument because the issues surrounding breach of contract are not the same as whether disclaiming third-party beneficiary rights is lawful.

Additionally, Defendants cite to non-precedential authority in *Golf Club, LLC v. Am. Golf Corp.*, No. 16-CV-946, 2017 WL 1655259, *Cleveland v. Talent Sport, Inc.*, No. 12-CV-789, 2013 WL 2178272, at *3 (W.D. Okla. May 17, 2013), *Vandelay Hosp. Grp. LP v. Cincinnati Ins. Co.*, No. 3:20-CV-1348, 2020 WL 4784717, at *7 (N.D. Tex. Aug. 18,2020), and *N.J. Clean Energy Solutions v. 100 Mount Holly Bypass,* 2021 WL 5728637, at *5 (D. Utah Dec. 2, 2021) as examples of where declaratory judgments are duplicative—suggesting that to be the case here. Doc. 21, Motion at 13-14.

 In *Golf Club*, the court found the declaratory judgment action duplicative where plaintiffs (1) sought a declaratory judgment that defendant lessors were in default of a lease for failure to satisfy the obligation of the lease and (2) that lessors were in breach of contract for failing to satisfy obligations under the lease. *See Golf Club*, 2017 WL 1655259, at *1.  Because the plaintiffs of that case failed to show an issue "for resolution by declaratory relief that

cannot be resolved in the context of its separate claim for breach of contract [,]" the court

dismissed the declaratory judgment action. *Id*. at \*2. Likewise, in *Cleveland v. Talent Sport,* the

plaintiff sought declaratory judgment that defendants breached their contract, in addition to a

breach of contract claim. *See Cleveland,* 2013 WL 2178272, at \*1. Defendants further cite to

*Vandelay Hosp. Grp. LP* for its reliance on *Cafe Plaza de Mesilla Inc v. Cont. Cas. Co*., 519 F.

Supp. 3d 1006, 1016 (D.N.M. 2021). Doc. 21, Motion at 14. In *Café*, the Court

dismissed declaratory judgment claims as duplicative of breach of contract claims because

"rul[ing] against Plaintiff on its breach of contract claims [ ] necessarily resolv[ed] all issues

identified in Plaintiff's declaratory judgment claims." *Cafe Plaza de Mesilla Inc. v. Cont. Cas.

Co*., 519 F. Supp. 3d 1006, 1016 (D.N.M. 2021). Lastly, Defendants cite to *N.J. Clean Energy

Solutions v. 100 Mount Holly Bypass* as an example for a dismissal where plaintiff sought a

declaratory judgment that it "is a third-party beneficiary of [certain] contracts," because "[t]his is

not a 'case or controversy' that would invoke the declaratory judgment statute because such a

declaration would have no practical effect." *N.J. Clean EnergySolutions*, 2021 WL 5728637, at

\*5.

    These cases are factually and legally distinguishable from Plaintiffs' case because the

declaratory judgment claims there sought to declare a breach of contract or an element of breach

of contract. Here, the declaratory relief sought in connection to the First Cause of Action does

not establish any element of breach of contract, not even that plaintiffs are third party

beneficiaries, but again centers on the unlawfulness of the contract's disclaimer of third party

beneficiary rights. *See* Doc. 1, Compl. ¶¶159-175. Although resolving the breach of contract

claim will necessarily raise the issue of whether the disclaimer is enforceable against Plaintiffs as

third party beneficiaries, it does not necessarily and conclusively resolve the issue of whether the disclaimer is unlawful on its face—as a declaratory judgment would.

Moreover, unlike Defendants' cited cases, resolving the issue of the legality of the third party disclaimer does not resolve the substantive claim of whether Defendants are in breach of contract. Defendants concede this in their motion. *See* Doc. 21, Motion at 13 ("Plaintiffs would still need to prove that the MCO Defendants breached an enforceable provision of the Agreements, and Plaintiffs would still need to prove that they are entitled to the relief they seek."). Also, the relief sought in the First Cause of Action does not include nominal and punitive damages sought in the breach of contract claims. Despite the distinction between the claims and relief sought, a declaratory judgment is useful because it clarifies the rights of Plaintiffs to even bring a breach of contract claim, resolves whether Defendants must exercise a duty to settle in good faith, and potentially guides the course of Defendants future conduct toward Plaintiffs and all third-party beneficiaries, with respect to third-party enforcement. *See Anderson Living Tr. V. ConocoPhillips Co., LLC*, 952 F. Supp. 2d 979, 1034 (D.N.M. 2013) ("A declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply proclaim liability from a past act.").

Nevertheless, to the extent that Defendants otherwise argue that declaratory judgment is unnecessary or redundant, dismissal is inappropriate because "[t]he existence of another adequate remedy does not preclude a declaratory judgment." Fed. R. Civ. P. 57; *see also Sensoria, LLC v. Kaweske*, 2021 WL 103020, at *15 (D. Colo. Jan. 12, 2021) (denying motion to dismiss declaratory judgment as duplicative at motion to dismiss stage); *Morinville v. United States Patent & Trademark Office*, 442 F. Supp. 3d 286, 296 (D.D.C. 2020) (denying motion to dismiss for the same reason); *MALIREDDY S. REDDY, Plaintiff/Counter Defendant, v.*

*ESSENTIA INSURANCE COMPANY, Defendant/Counter Plaintiff.*, 2021 WL 3742243, at \*7 (D. Colo. Aug. 24, 2021), *report and recommendation adopted sub nom. Reddy v. Essentia Ins. Co.*, 2022 WL 2287536 (D. Colo. Feb. 18, 2022) (recommending denial of motion to dismiss declaratory judgment as duplicative at motion to dismiss stage).  Thus, "declaratory relief is alternative or cumulative and not exclusive or extraordinary." Fed.R.Civ.P. 57 advisory committee's note (1937 adoption).

### E.  The Contract's Dispute Provision Does Not Apply to Plaintiffs and Proposed Class.

Defendants insist that Plaintiffs are bound to "fulfill [] the preconditions to bring a lawsuit mandated by the Agreements," just as if they were signatories to the Agreements.   Doc. 21, Motion at 12.  Defendants refer to the contractual provision that a "dispute concerning performance of the Agreement shall be reported in writing to the MAD Director within thirty (30) Calendar Days of the date the reporting Party knew of the activity or incident giving rise to the dispute." Doc. 21-1 at 338, Section 7.11.3.2.

Defendants cite to *Leyba v. Whitley*, 907 P.2d 172, 175 (N.M. 1995) to support their argument that Plaintiffs are required to engage with the contract's dispute resolution provision. Defendants are correct that the Court of Appeals held in *Leyba* that third-party beneficiaries are accorded "traditional contract remedies." However, nowhere does the court in *Leyba* suggest that the beneficiaries to a contract must perform the duties of parties to a contract.  *Leyba v. Whitley*, 907 P.2d 172, 175 (N.M. 1995); *see also, Ramirez v. Dawson Prod. Partners, Inc.,* 2000-NMCA-011, ¶ 10 ("[C]ases are not authority for propositions they do not consider.").

To the contrary, New Mexico precedent on this point directly undercuts Defendants' broad assumptions.  Specifically, in *Murken v. Suncor Energy, Inc.*, 2005-NMCA-102, the New Mexico Court of Appeals addressed whether a non-signatory is *a priori* subject to an arbitration

22

clause in a contract, when his claims derive, at least in part, from that contract.   The Court held that a *signatory* to an arbitration clause is estopped from claiming he is bound by the clause he agreed to, "when the signatory's claims are intertwined with the contract."  *Id.* ¶ 9.  In contrast, a "non-signatory 'cannot be estopped from denying the existence of an arbitration clause to which it is a signatory *because no such clause exists*.'"  *Id.* ¶10 (emphasis added)(*quoting Thomson-CSF, S.A., v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995)).  Thus the Court of Appeals agreed that the "crucial lesson" of *Thomson* is the "distinction between estopping a non-signatory as opposed to a signatory claimant."  *Id.* (citation omitted).  A non-signatory may only be held to an arbitration clause if the agreement to arbitrate would otherwise "be rendered meaningless."  *Id.*, ¶ 12.[10]

In *Damon v. StrucSure Home Warranty*, 2014-NMCA-116, the Court of Appeals made this distinction clear.  There, the court held that there is a narrow exception to the general rule set forth in *Murken*.  In *Damon*, a home purchaser bought a house that was covered by a home warranty.  While the court did not address this point, it is certainly notable that plaintiffs in *Damon* were successors in interest, not third party beneficiaries, and therefore stepped one hundred percent into the shoes of their predecessors in interest.  Thus the court's holding is both unremarkable and inapplicable to the case at bar, where Plaintiffs do not seek to usurp HSD's role in the contract.  Indeed, following the logic that Plaintiffs are successors to all the duties assigned HSD under the contract would require Plaintiffs to pay for their own nursing services, because HSD is the payor under the Agreements.  And by the same token, if Plaintiffs succeed to all the duties assigned to Defendant MCOs, then they must provide themselves nursing services.

---

[10]Here, of course, the "dispute resolution" provision of the Agreements is not an arbitration clause; it is a different form of alternate dispute resolution.

Again, the "dispute resolution" provision of the HSD/MCO Agreements is *not* an arbitration clause. Section 7.11.3 is far more intricate than a standard arbitration clause, requiring very specific and unique actions to resolve disputes *between the Parties,* specifically defined as HSD and the MCOs.  *See* Doc. 21-1 at 5, Recitals ("HSD, the Collaborative and the CONTRACTOR (each individually a "Party" and collectively the "Parties"))."  If anything, however, the logic of *Murken* holds even faster here, precisely because Section 7.11.3 was expressly designed to apply to the types of disputes that might arise between HSD and the various managed care organizations that have agreed to provide healthcare services to Medicaid recipients.  Defendant MCOs have made no showing that the alternative dispute resolution clause in their agreements with HSD would be rendered meaningless if Plaintiffs are not forced to participate, as required by the holding in *Murken*.  If anything, Defendants themselves are trying to make Section 7.11.3 meaningless, by attempting to impose "dispute resolution" on Plaintiffs' third party beneficiary claims against *both* Parties – HSD *and* the MCOs.

Even a cursory review of the cited dispute resolution process, as described in Section 7.11.3, makes crystal clear that the entire process is directed to claims concerning billing and other similar matters.  *See* Doc. 21-1 at 339, Section 7.11.3.  Thus Section 7.11.3.1, the introductory section, provides that "[e]xcept for termination of this Agreement, any dispute concerning remedies, sanctions, and/or damages *imposed under Section 7.3 of this Agreement* shall be reported, in writing to the MAD Director within fifteen Calendar Days of the date the reporting *Party* receives notice of the sanction."  Doc. 21-1, page 339, Section 7.11.3.1 (emphasis added).  Section 7.11.3.2 is a catch-all section to Section 7.11.3.1., providing merely that "[any] other dispute concerning performance of the Agreement" must also be reported by the *Party* to the MAD Director.  *Id.*, Section 7.11.3.2.

As if this were not sufficient to demonstrate that the dispute resolution process is limited to the *Parties*' claims concerning services and payment, Section 7.11.3.3 then reiterates that the entire section applies to *Claims*: "Failure to file a timely appeal shall be deemed acceptance of the MAD Director's decision and waiver of any further *Claim*."   Doc. 21-1, page 339, Section 7.11.3.3; *see also* page 340, Section 7.11.3.7  ("Failure to file a timely appeal shall be deemed acceptance of the MAD Director's decision and waiver of any further *Claim*." ). Significantly, "*Claim***"** means a bill for services submitted to the CONTRACTOR manually or electronically, a line item of service on a bill, or all services for one Member within a bill.").  Throughout the contract, "Claim" is consistently referenced according to this definition as payment for services, and in disputes involving non-compliance with the contract it is held in distinction from lawsuits. *See* Doc. 21-1 at 167, §4.9.2.32 ("Claims, losses, or suits"); 333, § 7.8.1.2 ("any losses, liabilities, damages, penalties, costs and fees from any Claim or action"); 349, § 7.16.4.2  ("all litigation, Claims, financial management reviews or audits"); 352, § 7.17.3 ("all Claims, lawsuits, administrative proceedings, judgments, losses, or damages, including court costs and attorney fees, or causes of action"); 353, § 7.17.4  ("indemnity actions and/or disputed Claims"); 353, § 7.17.7 ("Claim, loss, damage, suit or action"); *Cf.* Doc. 21-1 at 188, § 4.12.1.1 ("Member rights and responsibilities, the resolution of Member Grievances and Appeals, and Claims") & 274, § 4.20.1.1.2 (" Claims, Encounters, Grievance and Appeals").  Therefore, the waiver of "*Claims*" does not mean cause of action either by contractual definition or by reference, and does not have any effect whatsoever on Plaintiffs' claims as third party beneficiaries.

Further, to comply with the PPA, managed care organizations cannot impose any preemptive dispute resolution process on members without notice to Plaintiffs. *See* Section 59A-57-4(B) (a managed health care plan shall provide "written material that contains, in a clear,

conspicuous and readily understandable form…grievance procedures, appeal rights and the patients' rights generally available to all covered persons").

Finally, Defendants' position lacks good faith because if they truly expected Plaintiffs to engage the dispute provision, they would have and should have indicated that in the managed care health plan, as required by the PPA, but they do not. *See* Section 59A-57-4(B) (a managed health care plan shall provide "written material that contains, in a clear, conspicuous and readily understandable form…grievance procedures, appeal rights and the patients' rights generally available to all covered persons").

Therefore, Defendants' motion to dismiss on this point is misplaced and is not a basis to dismiss Plaintiff's breach of contract claims or otherwise excuse Defendants' conduct.

### F.  Punitive Damages against Defendants Is Warranted.

Defendants correctly articulate the standard for an award of punitive damages in New Mexico, *See* Doc. 21, Motion at 15. However, the relevant Uniform Jury Instruction adopted by the New Mexico Supreme Court states the law more completely:

> Only if you find that _____ (*name of party against whom punitive damages are sought*) breached the contract and that [his] [her] [its] conduct in committing the breach was [malicious], [reckless], [wanton], [oppressive], [or] [fraudulent] [rather than being legitimate or justified in the circumstances], then you may award punitive damages against [him] [her] [it].
>
> [Malicious conduct is the intentional doing of a wrongful act with knowledge that the act was wrongful.]
>
> [Reckless conduct is the intentional doing of an act with utter indifference to the consequences.]
>
> [Wanton conduct is the doing of an act with utter indifference to or conscious disregard for a person's rights.]

*See* Uniform Jury Instructions-Civil, Rule 13-861 NMRA (punitive damages for breach of contract); *See also Romero v. Mervyn's*, 1989-NMSC-081, ¶ 25("'Malice' as used in our

punitive damages instruction does not imply 'actual malice' or 'malice in fact' in the sense of an intent to harm.").

While Defendants assert that "Plaintiffs here have not pleaded any facts that could demonstrate that the MCOs acted with the requisite culpable state of mind required for imposing punitive damages[,]" a cursory look at the Complaint reveals otherwise. *See* Doc. 21, Motion at 15.

To begin, Plaintiffs have pleaded that Defendants knew of their contractual obligation to provide medically necessary private duty nursing services to Plaintiffs, and that Defendants assumed the risk of loss under the contract. *See* e.g. Doc. 1, Compl. ¶ 3. Defendants knew of their breach because Plaintiffs pointed it out to them, demanding the services they were owed. *Id*. ¶ 108 (Plaintiff A.C.); ¶ 126 (Plaintiff C.V.); ¶¶ 146-148 (Plaintiff M.G.). Defendants declined to cure this breach, as shown by the continuing shortfall of medically necessary nursing hours for each Plaintiff, as of the filing of the complaint. *Id.* ¶¶ 13-15. These facts support an inference that Defendants knew they were required to provide medically necessary nursing services to plaintiffs, per the contract, and they breached their agreement to do so—an intentional doing of a wrongful act.

Next, Defendants knew that by denying nursing care to Plaintiffs, it was wrongful, not only because it breached the contract, but because Defendants had previously approved the number of hours Plaintiffs could access. *Id.* ¶ 36, ¶¶ 106-112 (Plaintiff A.C.); ¶¶ 126-132 (Plaintiff C.V.); ¶¶ 144-150 (Plaintiff M.G). These facts support an inference of malicious conduct, because the breach was done knowing that it was wrongful to Plaintiffs.

Defendants also knew that the denial of medically necessary services placed Plaintiffs at risk of institutionalization, by virtue of their Medically-Fragile Waiver participation. *Id.* ¶¶ 117-

120 (Plaintiff A.C.); ¶¶ 139-141(Plaintiff C.V.); ¶¶ 144-157 (Plaintiff M.G); *see also* 8.290.400.10 (C)(2)(a) NMAC. Moreover, the denial of medically necessary services has spanned years for Plaintiffs going as far back to 2020. Doc. 1, Compl. ¶ 108 (Plaintiff A.C. demanding requisite hours on June 22, 2021); ¶129 (Plaintiff C.V. facing nursing shortfall on June, 30, 2020); ¶ 144-145 (Plaintiff M.G. faced a shortfall since April 26, 2021). The fact that Defendants allowed the breach to continue allows a jury to infer Defendants are indifferent to Plaintiffs' medical needs.

To underscore this, Plaintiffs have alleged that each Defendant "receives capitated payments from HSD, but artificially lowers its costs by simply not delivering promised services to vulnerable children who, through no fault of their own, require medically necessary services to meet their undisputed needs—deflecting the risk the MCO contractually agreed to bear onto its beneficiaries." *Id.* ¶ 3. Plaintiffs devoted an entire section of the Complaint alleging the billions of dollars Defendants make which "reflects their capacity to financially incentivize—to whatever extent needed—the hiring of local, traveling, or international nurses. Yet Defendants MCOs failed to do so." *Id.* ¶ 98. This supports inferences not only that Defendants' breach was malicious, reckless, and in conscious disregard of Plaintiffs' rights, but also that the breach was fraudulent to the extent that Defendants received capitated payments to provide services they knew they were not providing or were going to provide.

Also, Defendants cite to the Complaint's mention of the UNM Qualitative Study reflecting a survey of families denied nursing hours, claiming "the minority of people who do not receive the full amount of in-home nursing services allotted to them claim that this deficiency is *due to limited availability*[.]" Doc. 21, Motion at 16.  However, the question posed to the

families surveyed was: "Is it your choice or because of limited availability of services?"[11] The study's reductive either-or type question did not leave room for other explanations.  Read differently, the question merely asked whether assented to the denial of nursing services, and fifty-three (53) families responded they did not. Their responses do not create a justification for the denial of approved nursing hours.

Additionally, Defendants' minimization of the problem, stating it only affected a "minority of people"— fifty-three (53) families—does not serve their argument.  Rather, it shows how minimal the burden is on Defendants (split between all three MCOs) in light of the demand. Although Defendants promised to deliver services to the entire state and agreed to bear the risk of financial loss, they decided to let fifty-three (53) children go without medically necessary care, rather than pay what was minimally necessary, and what they could clearly afford, to secure a low number of nurses—not hundreds or thousands. *See* Doc. 1, Compl. ¶ 98. This only heightens the inference that the shortage of medically necessary nursing services has been caused by Defendants acting with indifference to the needs of Plaintiffs and proposed class, rather than an inability to help.

Defendants had immense capacity and time to correct the breach, or prevent it altogether, and they decided not to try; knowing that this lack of effort not only violated Plaintiffs' rights, but also places them—medically fragile children—in harm's way, through no fault of their own. Such conduct "is inconsistent with legitimate business interests, violates community standards of decency, and tends to undermine the stability of expectations essential to contractual

---

[11] See Exhibit 3, Anthony Cahil, Ph.D. & Heidi Fredine, MPH A Report on the 2021 Needs Assessment of Parents Served by the Medically Fragile Case Management Program at the Center for Development and Disability (July, 2021) (University of New Mexico Center for Development and Disability); *see also* Doc. 1, Compl. ¶ 36 n.2.

relationships." *See Romero*, 1989-NMSC-081, ¶ 34 (explaining when punitive damages are justified in a breach of contract).

In light of this, Plaintiffs disagree with Defendants' characterization that "the only explanation mentioned in the Complaint as to why Plaintiffs did not receive the in-home nursing services was that it was due to nursing shortages." *See* Doc. 21, Motion at 16.  To the contrary, Plaintiffs allege that Defendant intentionally sidestepped their obligation to provide services, or even attempt to obtain services, by vague references to a "nursing shortage."  Plaintiffs are not required to accept this excuse.  Once again, Plaintiffs' allegations are very similar to the allegations in *Norwood*, where there was "no indication that [Defendants would] (unless compelled by the courts) lift a finger to find nurses to provide home nursing for children in [Plaintiffs'] situation."  *Norwood*, 838 F.3d at 841–42.  To the extent Defendants disagree with this assessment of their conduct, this is a dispute of fact.

## V.     CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss.

Respectfully Submitted,

DISABILITY RIGHTS NEW MEXICO

By:/s/ Maxwell Kauffman
    Maxwell Kauffman
    Jason C. Gordon
    Jesse D. Clifton
    Holly J. Mell
3916 Juan Tabo Blvd., NE
Albuquerque, NM  87111
Telephone:  505-256-3100
mkauffman@drnm.org
jgordon@drnm.org
jclifton@drnm.org
hmell@drnm.org

NEW MEXICO CENTER ON LAW AND POVERTY
Stephanie Welch
301 Edith Blvd., NE
Albuquerque, NM  87102
Telephone:  505-255-2840
stephanie@nmpovertylaw.org

- and -

LAW OFFICES OF NANCY L SIMMONS PC
Nancy L. Simmons
120 Girard Blvd SE
Albuquerque, NM 87106
Telephone:  505-232-2575
nlsimmons@swcp.com

**Attorneys for Plaintiffs**

We hereby certify that by means of
the CM/ECF system, we have filed
the foregoing and served it on all counsel
of record this 6th day of September 2022.

_____/s/ Maxwell Kauffman_____
Maxwell Kauffman