UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

M.G., a minor, et al.,

        Plaintiffs,

v.                        No. 1:22-cv-00325 MS/GJF

DAVID SCRASE, et al.,

        Defendants.

## PLAINTIFFS' OPPOSED MOTION FOR PRELIMINARY INJUNCTION AS TO STATE DEFENDANTS AND MEMORANDUM IN SUPPORT THEREOF

Individually named Plaintiffs and the Proposed Class ("Plaintiffs") are designated by the State of New Mexico as "medically fragile children." As such, they are legally entitled by the Medicaid Act and federal disability discrimination laws to receive in-home Private Duty Nursing ("PDN") services.

Plaintiffs and Disability Rights New Mexico ("DRNM") **move this Court for a Preliminary Injunction**, ordering the New Mexico Human Services Department ("HSD") and Secretary David Scrase ("State Defendants") to provide or ensure PDN services. State Defendants do not consent to Plaintiffs' Motion. Defendant Blue Cross, Presbyterian and Western Sky ("Managed Care Organizations" or "MCOs") take no position on the Motion until they are able to review it.

Plaintiffs M.G. and C.V. are four years old. Plaintiff A.C. is ten years old. All three children have multiple serious and life threatening conditions and disabilities. All three children, as well as the proposed Class, are entitled to receive in-home nursing care through the State's taxpayer funded Medicaid Managed Care program. Specifically, as "medically fragile children," Plaintiffs are entitled to receive "early and periodic screening, diagnostic, and treatment

services" ("EPSDT"). 42 U.S.C. § 1396d(a)(4)(B). EPSDT services include Private Duty

Nursing Services. *Id.* State Defendants have accordingly approved Plaintiffs to receive PDN

Services, pursuant to the Medicaid Act.

However, contrary to federal law, State Defendants have failed to ensure reasonably

prompt delivery of these services. As a result, Plaintiffs live without the services they need to

remain safe and stable, often unable to venture safely outside their homes, and at risk of

institutionalization, physical and mental deterioration, hospitalization, and other harms.

State Defendants have entered into three contracts – with Blue Cross, Presbyterian, and

Western Sky – to provide PDN services to medically fragile children. Through their contracts

with HSD, Defendant MCOs receive a "capitated payment" from taxpayers to oversee Plaintiffs'

nursing care, which means that the MCO is supposed to assume the risk of loss if the State funds

allocated are insufficient to meet a child's needs. Contrary to their contracts with the State and

applicable law, Western Sky, Blue Cross, and Presbyterian have declined or refused to provide

medically necessary nursing services, in the amount the State has already deemed to be

medically necessary, to eligible children. Because these managed care organizations are

nonetheless paid for the greater services *promised*, not the lesser services *provided*, they have

received profits they have not earned.

State Defendants have failed to enforce the State's contracts with the MCOs or to

otherwise arrange for Plaintiffs to receive the nursing services the State has already approved.

Thus State Defendants are violating the Medicaid Act by failing to "arrang[e] for . . . corrective

treatment." 42 U.S.C. § 1396a(a)(43)( C). State Defendants are also failing to provide medical

services with "reasonable promptness." 42 U.S.C. § 1396a(a)(8).

Moreover, State Defendants are also violating Title II of the Americans with Disabilities

Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504").  These Acts require State Defendants to provide services in the most integrated setting appropriate for people with disabilities and to minimize the risk that they will be forced into institutions to receive services. 42 U.S.C. § 12131-32; 29 U.S.C. § 794.

## I. Plaintiffs' Statement of Undisputed Facts

1.   Until August 31, 2022, Margaret Agard was employed as a Senior Registered Nurse Case Manager by the UNM Medically Fragile Waiver Case Management Program. **Declaration of Margaret Agard ("Agard"), Ex. 1, ¶¶ 1-6.** Agard's case load of medically fragile children included children with critical medical diagnoses and developmental disabilities. *See, e.g., id.,* **¶ 11.**

2.   Agard conducted "Level of Care" assessments for these children. *Id.,* **¶¶ 6-11.** Her assessments then went through several steps of review and approval. *Id.* Once the Level of Care is approved, the RN Case Manager develops the "Individual Service Plan" ("ISP") for the child, as well as a budget. *Id.,* **¶¶ 13-16.** The child's MCO must approve both the ISP and the budget. *Id.,* **¶¶ 14; 18.**

3.   According to Agard,

> The determination that the child requires a "Nursing Facility Level of Care" means that the child needs access to caregiving services in the community, including Private Duty Nursing ["PDN"], to avoid institutionalization and to mitigate the dangers of life-threatening episodes at home and in the community. . . . *Id.,* **¶ 19.**

4.   The MCOs receive prompt notice when a family is not receiving the PDN services allotted to them. *Id.,* **¶¶ 21-23.** In Agard's experience, families "wait an unpredictable amount of time before they are provided [PDN] services, [sometimes] months to over a year." *Id.,* **¶ 23.**

5.   Agard has observed that the MCOs seldom if ever attempt to cover the shortage of PDN hours by contracting with outside agencies or nurses. *Id.,* **¶¶ 23; 25-26.** Based on her

experience, Agard believes the rate of pay for PDN agency nurses is a significant factor in the shortage of nurses who can fill this need. *Id.*

6.   Families who are denied PDN hours struggle to provide adequate care. "For one family, a report was made to CYFD because the nurse failed to make sure the mother was fully awake before leaving her shift, which then left the child unattended." *Id.*, ¶ 29. Agard has "seen a foster parent refuse to accept their foster child's discharge from a hospital because they were unable to secure the support of [PDN] services in the home." *Id.*, ¶30. "Others have, in moments of desperation, considered difficult options such as the viability of surrendering their child to the care of CYFD to secure services or placing their child at Casa Angelica, New Mexico's only Intermediate Care Facility for Individuals with Intellectual Disabilities (ICF/MR, in New Mexico) appropriate for children who are medically fragile." *Id.*

7.   Plaintiff M.G. is four years old. M.G. currently lives at home in Rio Rancho, with her mother and father. She participates in New Mexico's Medically Fragile Waiver program as a consumer of Western Sky's managed care plan. *See generally* **Declaration of Christina Garcia ("Garcia"), Ex. 2.**

8.   M.G. suffers from numerous chronic and severe medical conditions that require constant monitoring. *Id.*, ¶¶ 4-6; 13. M.G. was hospitalized after birth. Prior to discharge, at 10 months old, M.G. was referred to the Medically Fragile Waiver in 2019. M.G. was determined eligible for 84 hours/week of in home private duty nursing by Western Sky, due to her disabilities and dependency on a ventilator support at home. *Id.*, ¶¶ 7-9.

9.   Earlier this year, in 2022, M.G. was again hospitalized.

> While admitted in the hospital, M.G. acquired a condition called Propofol Related Infusion Syndrome (PRIS), a rare and often fatal condition, and remained hospitalized for approximately six weeks. According to her physicians at the University of New Mexico Hospital, M.G. is the only three-year-old female known to have survived the

condition. *Id.*, ¶ 5.

10. According to her mother, "without [PDN] services M.G. is at risk of requiring additional hospitalizations, institutionalization, or even death." *Id.*, ¶ 14.

11. "M.G.'s nurses . . . help her maintain her range of motion and [skill] development. . . . M.G. suffers both physically and developmentally when she cannot access [PDN] services." *Id.*, ¶ 15. "She also misses opportunities to engage with her community safely. She misses school and the associated supports that are available to her there, and opportunities for engagement with her peers in the community and at school." *Id.*; *see also* ¶ 12.

12. When a nurse is with M.G., her mother knows "she is in capable and trained hands, and [she feels] M.G. is safe and secure. . . . [She does] not feel that [she] would be as good a mother or caregiver to M.G. without the support of those services in [her] home . . . ." *Id.*, ¶ 20.

13. During 2021, M.G.'s mother contacted Western Sky several times on behalf of M.G., informing Western Sky that M.G. was not receiving sufficient hours of in-home PDN services, and requesting that Western Sky furnish the requisite hours.

14. On October 1, 2021, Western Sky wrote a letter to M.G.'s mother, indicating that Western Sky had "resolved" the complaint by referring it to the Provider Relations Department, who in turn contacted the private duty nursing agency, who in turn cited nursing shortages and an inability by other home skilled nursing agencies to hire new staff. **Letter from Mindy Anderson, 10/01/21, p. 1, Ex. 3 ("Western Sky").**

15. As of the filing Plaintiffs' complaint, M.G. was only provided access to 79 hours per week of the 84 medically necessary nursing hours for which she has been approved. Prior to September 2022, M.G. typically had not received all of the hours of private duty nursing she requires. Most of 2021, M.G. was able to access only half or less of the hours that she needs

and qualifies for. After M.G.'s second hospitalization in September 2022, M.G. started to receive her full allocation of 84 hours per week. **Garcia, Ex. 2, ¶ 10.**

16. Plaintiff A.C. is a ten-year-old girl. She lives at home with her parents and two other siblings, in Albuquerque. She has been diagnosed with Rett Syndrome, epilepsy, and global developmental delays. **Declaration of Alicia Cortez ("Cortez"), Ex. 4, ¶¶ 4-7.** Rett Syndrome is a chronic and life threatening medical condition. **Letter from Rebecca Spring, Certified Nurse Practitioner, 09/11/22, Ex. 5 ("Spring").** A.C. was accepted into the Medically Fragile Waiver program in December 2019, as a participant in Blue Cross' managed care plan. **Cortez, Ex. 4, ¶ 21.** State Defendants and Blue Cross determined that A.C. met Nursing Facility Level of Care. *Id.* As of March 2020, A.C.'s level of care has been determined to require 40 hours of private duty nursing services per week. *Id.*, **¶ 22.** "A.C. has received less than 400 hours of nursing services, despite her qualification for more than 5,000 hours of nursing services within the 2.5+ years that she has been participating in the Medically Fragile Children program." *Id.*, **¶** 23.

17. A.C. cannot hold her own body weight and has difficulty swallowing and digesting food and breathing. *Id.*, **¶¶ 4-7.** A.C. must be monitored for breath holding episodes. *Id.*, **¶ 11.** A.C. has lost all functional use of her hands. *Id.*, **¶ 7.**

18. In fall 2020, A.C. experienced two weeks of non-stop seizures. *Id.*, **¶ 9.** At one point, her medications made her heart stop. *Id.* A.C.'s seizures can become emergencies. *Id.*, **¶ 14.**

19. A.C.'s mother has difficulty transporting A.C. without the assistance of a nurse. *Id.*, **¶ 15.** At school, A.C. has a 1:1 aide and an onsite registered nurse and nurse assistant to help her. *Id.*, **¶ 18.**

20. On June 22, 2021, A.C., through her mother, submitted a demand to Blue Cross, through

A.C.'s case manager, to satisfy the approved PDN hours, pursuant to the hours Blue Cross had already approved. Blue Cross failed to furnish the hours requested following this demand and others. By February 28, 2022, A.C. faced an average shortfall of 23.8 hours per week of PDN hours approved by Defendant Blue Cross. On June 28, 2022, Blue Cross offered only to "review all nursing agency providers and possibly other providers *that are in the [Blue Cross] network*." **Letter from Amanda P., 06/28/22, p. 2 Ex. 6** (emphasis added).

21. Should A.C. not receive requisite medically necessary in-home nursing services, she may need to go to an institution or otherwise face a life-threatening circumstance. **Spring, Ex. 5.**

22. During times when A.C. is experiencing an increased medical need, it is difficult and overwhelming for her mother to assess and determine what kind of care she needs in the moment without a skilled nurse. **Cortez, Ex. 4, ¶ 33.** Nonetheless, her mother "cannot fathom the idea of institutional care for [her] child." *Id.*, ¶ **35.**

23. Plaintiff C.V. is a four-year-old boy. C.V. currently resides in Sandia Park, New Mexico, at home with his mother and father. *See generally* **Declaration of Victoria Vaughn ("Vaughn"), Ex 7.** He has been diagnosed with a chronic and life threatening medical condition. *Id.;* **Letter from Stephanie Gehres, MD, 08/25/22 ("Gehres"), Ex. 8.**

24. C.V. "receives services through the medically fragile program for the State of New Mexico, which means the State . . . recognizes [C.V.] is disabled and has complex medical needs. While [C.V.] receives some nursing care through this program, he unfortunately does not receive the nursing hours he qualifies for." **Gehres, Ex. 6;** *see also* **Vaughan, Ex. 7**

25. C.V.'s mother describes C.V.'s typical day as follows:

> Every day C.V. must get over 6 medications that must be spaced out. C.V. needs moving and repositioning of his extremities every two hours while awake. His oxygen and heart rate must be monitored. He must be tube or orally fed 5 times a day and monitored for signs of aspiration. He cannot drink water independently and must receive multiple water flushes throughout the day. . . .His gastronomy tube must be checked and maintained. He must be monitored for falls. He receives oxygen through the night and must be checked periodically. He can have over 50 seizures a day and needs a skilled person available to

provide emergency services and rescue medications as well as to keep him safely positioned. This is an average day for C.V. **Vaughn, Ex. 7, ¶ 12.**

26. On a bad day for C.V., risks associated with his medical conditions can be life threatening. He may need rescue medications if his seizures do not stop or he becomes non responsive. We don't know whether he will stop breathing so he needs constant monitoring. *Id.,* ¶ **13.**

27. "When nurses are available in the home, they help us triage and assess medical issues when

    they are happening. We know that they are trained and will respond quickly and

    appropriately to concerns. They help us assess when something is urgent." *Id.,* ¶ **16.**

    For example, C.V.'s nurse recently spotted signs and symptoms of aspiration in C.V. that we didn't catch. She recommended that we needed to ask our provider to schedule a swallow study for him. We would not have had the medical knowledge to ask for that assessment without the nurse, which could have put C.V. at risk for life threatening conditions like aspiration pneumonia. *Id.,* ¶ **18.**

28. C.V.'s mom provides a particularly enlightening description of the family's isolation:

    Without help, our family is isolated because we need someone available to monitor C.V. We frequently plan any family outing or errand around when a nurse is available so we can ensure C.V.'s safety.  For example, a few months ago a nurse helped monitor and clear C.V.'s airway during a routine car trip, which otherwise would have necessitated an unsafe vehicle maneuver to pull over and attend to him.

    It is very difficult for us to go out and be part of the community which is a big detriment to C.V. Without a medically trained professional to attend to C.V., we are stuck in the home which isn't good for us or our children.

    In addition, the community does not get to experience C.V.  It is incredibly difficult to participate in an outing as a family without a nurse, even more so if I want my other child and C.V. to experience something together. With a nurse, I was able to visit the aquarium with both my children.  I was able to help my other child use the restroom while our nurse attended to C.V. during a seizure.  C.V. was able to be fed, taken out of his wheelchair and touch the glass.  Other children were able to see C.V., ask questions about his feeding tube, and experience something they had never seen before. *Id.,* ¶¶ **24-26.**

29. C.V.'s family considers institutional care as a "last resort." *Id.,* ¶ **27.**  Initially, the family

    had planned for C.V.'s father to retire early to take care of C.V., due to inconsistent or

    lacking nursing services. *Id.,* ¶ **33.**  However, C.V.'s father was injured during the course of

his duty as a state police officer. ***Id., ¶ 33(2).*** "Jeremy has extreme difficulty picking C.V.

up and has very low stamina for interacting with C.V. without resting in a reclined, seated

position." ***Id., ¶ 33(2).***

30. Presbyterian has approved C.V. for 173 hours per month of private duty nursing services.

Currently, C.V. is only provided access to 26 hours per week of private duty nursing. ***Id., ¶***

**10;** *see also* **Letter from Linda Crider, 04/07/22, p. 1,Ex. 9.**

31. On March 25, 2022, C.V., through his parents, submitted a request to Presbyterian to satisfy

its obligation to provide the in-home nursing hours they have approved.  On April 7, 2022,

Presbyterian responded to C.V.'s parents by letter, acknowledging that C.V. was not

receiving the PDN hours allocated to him, but simply cited "nursing shortages" as a reason

for the denial and deemed the matter resolved. ***Id.***

32.  The Managed Care contracts between the MCOs and State Defendants provide that the

MCO "shall provide health care services to its Members in accordance with 42 C.F.R. §

438.206 through § 438.210." Doc. 21-1, page 113, § 4.5.1.1.1.  In turn, 42 C.F.R. § 438.206

provides:

> The State must ensure, through its contracts, that each MCO . . . consistent with the scope
> of its contracted services, meets the following requirements:
>
> (1) Maintains and monitors a network of appropriate providers that is . . . sufficient to
> provide adequate access to all services covered under the contract for all enrollees, . . . .
>
> *(4) If the provider network is unable to provide necessary services, covered under the
> contract, to a particular enrollee, the MCO . . . must adequately and timely cover these
> services out of network for the enrollee, for as long as the MCO . . . is unable to provide
> them.*

42 C.F.R. § 438.206 (emphasis added).  The MCO is further required to "provide Medically

Necessary Services . . . including but not limited to . . . the delivery of federally mandated

EPSDT services." *Id.*, pages 117-18, § 4.5.2.   If the MCO delivers only partial performance

of any term, such as occurred here, the State can "[r]equire the contractor prepare a plan to correct the cited deficiencies immediately . . . ." *Id.*, page 326, §§ 7.6.2.1.2-7.6.2.3.2.

33. Here, State Defendants have no evidence to support that they have provided all PDN services for which Plaintiffs are eligible. Neither do State Defendants have evidence to support that they have required the MCOs to provide nursing services out-of-network.

34. State Defendants have no evidence to support that there is a so-called "nursing shortage," rather than a shortage of nurses who are willing to accept the hourly rates offered by the MCOs. *See, e.g.,* **Agard; Ex. 1, ¶¶ 23; 25-26; Declaration of Elizabeth Holguin ("Holguin"), Ex. 10; Declaration of Eleanor Chavez, Ex. 11.**

### III.  The Role of the State of New Mexico in Administering the Federal Medicaid Program

The Medicaid Act, 42 U.S.C. §§ 1396- 1396w-5, sets up a medical assistance program available to participating states. Once a state elects to participate, it must follow program requirements mandated by the federal government.  HSD has been designated as the "single state agency" directly responsible for the administration and supervision of New Mexico's Medicaid program under 42 U.S.C. § 1396 (a)(5). Secretary Scrase oversees the State's compliance with the requirements of the Social Security Act.  42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10; NMSA 1978, §§ 27-2-16; 9-8-6; 9-8-12.

The Medicaid Act requires "early and periodic screening, diagnostic, and treatment services," sometimes referenced as "EPSDT," for individuals under the age of 21. 42 U.S.C. § 1396d(a)(4)(B).   Under EPSDT, HSD, as the designated single state agency, must "arrang[e] for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment" for EPSDT covered individuals, including medically necessary private duty nursing services. 42 U.S.C. §§ 1396a(a)(43)( C); 1396d ( r).

The New Mexico state legislature requires that "[HSD] shall provide for a statewide, managed care system to provide cost-efficient, preventive, primary and acute care for medicaid recipients[.]" NMSA 1978 § 27-2-12.6.

> The managed care system is a risk-based system, meaning an MCO bears the risk of loss if the State's fee does not cover all the costs for the healthcare that the Medicaid program requires MCOs to provide to individuals. In part, states moved to the new model to get away from the fixed rate imposed by the fee-for-services model, in an attempt to scale back the costs to states associated with the Medicaid program.

*Starko, Inc. v. NMHSD,* 2014-NMSC-033, ¶ 23.   Under this system, HSD entered into three identical Medicaid Managed Care Services Agreements with three MCOs:  Blue Cross, Presbyterian, and Western Sky.  All three contracts are effective for the term of January 19, 2018 through December 31, 2022, and most recently have been amended and restated for the term of December 27, 2022 through December 31, 2023.

"The agency must make available a variety of individual and group providers qualified and willing to provide EPSDT services." 42 C.F.R. § 441.61(b).  However, HSD remains the single state agency responsible for the supervision of the MCOs' compliance with federal law.  *See* 42 U.S.C. § 1396a(a)(5); *see also* 42 C.F.R. § 431.10. HSD may not delegate its responsibility to third parties.  *See, e.g., Wilson v. Gordon,* 822 F.3d 934, 953–54 (6th Cir. 2016).

### III.  Disability Rights New Mexico Has Associational Standing to Bring Suit on Behalf of Individuals Who Are Similarly Situated to Plaintiffs

DRNM has associational standing to represent unnamed medically fragile children who are not receiving the private duty nursing services for which they are qualified. *See Waldrop v. NMHSD,* 2015 WL 13665460, at *5–6 (D.N.M. 2015)("As the designated protection and advocacy system for the developmentally disabled citizens of

New Mexico, DRNM possesses the authority to 'pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such [developmentally disabled] individuals within the State who are or who may be eligible for treatment, services, or habilitation . . .'"), *citing* 42 U.S.C. § 15043(a)(2)(i); *see also Lewis v. NMDOH*, 2002 WL 35649595, at *7 (D.N.M. 2002)(same).

### IV.  Plaintiffs Meet the Applicable Legal Standards for a Temporary Restraining Order and Preliminary Injunction

To obtain a preliminary injunction, the moving party must demonstrate (1) that the plaintiff will suffer irreparable harm if the preliminary injunction is denied; (2) that the threatened injury to the plaintiff outweighs any injury the opposing party would suffer under the preliminary injunction; (3) that the injunction is not adverse to the public interest; and (4) that the plaintiff has a substantial likelihood of success on the merits of the case. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir.2004).  If a plaintiff establishes that the first three factors "tip strongly" in its favor, the likelihood of success inquiry is modified somewhat, and the plaintiff may establish this factor "by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th Cir.2003).  "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017).

In some instances, the Tenth Circuit applies a heightened burden on applicants, for "preliminary injunctions that (1) disturb the *status quo*, (2) are mandatory rather than

prohibitory, or (3) provide the movant substantially all the relief it could feasibly attain after a full trial on the merits." *Dominion Video Satellite*, 269 F.3d at 1154–55.

"[T]he *status quo* is the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Id.,* at 1155 (internal punctuation and citations omitted). For example, in *Schrier v. University of Colorado*, 427 F.3d 1253, 1260 (10th Cir. 2005), the plaintiff movant was excluded from his position as chair of the department of medicine, and sought reinstatement. Defendant contended that reinstatement was not the *status quo,* because the movant was not legally entitled to the chairmanship. Reasoning that the "*last peaceable uncontested status existing between the parties before the dispute developed*" was when the plaintiff *was*, in fact, serving as chair, the Tenth Circuit concluded that the plaintiff was not seeking to change the *status quo* by seeking reinstatement. *Id.* (emphasis added; citation omitted).

Here, similarly, the uncontested *status quo* relationship of the parties is Plaintiffs' eligibility for the services and supports indicated in their Individual Service Plans, before HSD's failure to provide the care with reasonable promptness. *See* 42 U.S.C. § 1396a(a)(8). State Defendants presumably will concede that the State's existing eligibility determination for Plaintiffs remains the *status quo.*

As Judge Judith Herrera held in *Waldrop,* existing eligibility is the key factor:

> . . . [T]he last peaceable uncontested status existing between the parties before the dispute developed was the level of benefits afforded to each individual plaintiff in their individual service plans before those benefits were reduced pursuant to the implementation of the SIS assessment method. Plaintiffs' motion for preliminary injunction requests restoration of the "DD Waiver services terminated or reduced as a result of the November 1, 2012 New Mexico regulations" [Doc. 11 at 33] – in other words, a return to the *status quo.*

*Waldrop,* 2015 WL 13665460, at *11 (citation omitted).

Logically, of course, *all* requests for preliminary injunctive relief change the *status quo* in one sense of the term, because the movant is presumably and necessarily dissatisfied with the circumstances immediately preceding the filing of the movant's request for relief or he would not be requesting judicial intervention – thus "*status quo*" is not defined by *present conditions,* lest this factor swallow the entire analysis:

> The Tenth Circuit has declined to adopt the standard that the status immediately preceding the application for a preliminary injunction is the status quo because such an approach
>
> > would imply that any party opposing a preliminary injunction could create a new *status quo* immediately preceding the litigation merely by changing its conduct toward the adverse party. To treat such a new status quo as the relationship which an injunction should not disturb would unilaterally empower the party opposing the injunction to impose a heightened burden on the party seeking the injunction.
>
> *Dominion Video Satellite, Inc.* 269 F.3d at 1155.

*Guidance Endodontics v. Dentsply Int'l, Inc.*, 633 F. Supp. 2d 1257, 1269 (D.N.M. 2008).

### Factors 1 and 2:  Plaintiffs Will Suffer Irreparable Injury that Outweighs any Prejudice to Defendants

The danger of irreparable injury is clear.  Plaintiffs have little or no alternative other than to rely on State Defendants for their medical needs.  All Plaintiffs live on the edge of a medical crisis, with the result that even minor variations in their condition may have disastrous consequences.  Thus all Plaintiffs are in danger of substantial deterioration in their mental and physical health and their living conditions if this Court does not intervene to assist them.  Moreover, Plaintiffs' current circumstances leave them isolated at home, segregated from the remaining community, because "venturing out" to school or even to the aquarium can be threatening to a medically fragile child's health, in the absence of the medical oversight provided by a nurse.

Courts often find a showing of irreparable harm where the movant's health is in imminent danger or remains in serious doubt. *See, e.g., Blackman v. DC,* 185 F.R.D. 4, 6–7 (D.D.C.1999) (referring to related case in which court found plaintiff had established irreparable harm where defendant was not administering necessary medication and catheterization to child); *Wilson v. Group Hosp. & Med. Servs., Inc.,* 791 F.Supp. 309, 314 (D.D.C.1992) (granting preliminary injunction where cancer patient's "health and future remain[ed] in serious doubt" and insurance carrier refused to pay for the only treatment that could save her life). This is especially so "where the health of a legally incompetent or vulnerable person is at stake." *Al-Joudi v. Bush,* 406 F.Supp.2d 13, 20 (D.D.C. 2005)(addressing irreparable injury to detainees at Guantanamo).

Here, pursuant to State Defendants' own rigorous review, Plaintiffs are already qualified to receive EPSDT services due to their legal designation as "medically fragile children," which is characterized by the State as *either* "a life threatening condition," including "acute exacerbation," during which the absence of heightened medical supervision "would require hospitalization," *or* dependence of highly specialized care, without which "a reasonable level of health could not be maintained." 8.290.400.10 (C)(2)(a) NMAC. Examples include ventilators and dialysis machines. *Id.; see, e.g., Fisher v. Maram,* WL 2505833, at *4 (N.D. Ill. 2006)(child's health was "fragile due to the myriad of documented medical conditions from which she suffers and clearly, she stands to suffer irreparable harm if the injunctive relief she seeks is denied").

Indeed, *as a matter of law,* by their very designation as "medically fragile children," Plaintiffs have been determined to be likely to be institutionalized if this Court does not order fulfillment of their designated private duty nursing service hours. *See*

8.320.2.19 (B), NMAC (once a child is found eligible, "PDN services must be furnished," with the "goal . . . to avoid institutionalization and maintain the . . . eligible recipient's function level in a home setting"). This is *per se* irreparable.

Moreover, one "key respect" of the harm of institutionalization, as described by the Supreme Court in *Olmstead,* is to be forced to "*relinquish participation in community life they could enjoy given reasonable accommodations . . . .*" *Id.*  527 U.S. at 600-01 (emphasis added).  Here, while Plaintiffs currently are not institutionalized, they are at peril to be so, and the denial of PDN services has resulted in their being isolated in their own homes, effectively denied participation in the community.

In contrast, the adverse consequences to the State are minimal.  The State, as a matter of law, cannot reduce or terminate Medicaid benefits to Plaintiffs, where the approval of services has already occurred.  Thus Plaintiffs are requesting services to which they are already entitled.  State Defendants will only be required to arrange for the in-home nursing services that they already authorized.

In *Haskins v. Stanton*, the Seventh Circuit affirmed the district court's decision enjoining the defendants from violations of the Food Stamp Act.  794 F.2d 1273 (7th Cir. 1986).  The court emphasized the minimal burden imposed when a defendant is required to comply with its legal responsibilities, especially with regard to the public welfare:

> Because the defendants are required to comply with the Food Stamp Act under the terms of the Act, we do not see how enforcing compliance imposes any burden on them. The Act itself imposes the burden; this injunction merely seeks to prevent the defendants from shirking their responsibilities under it.

*Id.* at 1277.  Thus "[t]he State's potential budgetary concerns are entitled to our consideration, but do not outweigh the potential harm to... indigent individuals, especially when the State's position is likely in violation of state and federal law."

*Bontrager v. Indiana Fam. and Soc. Servs. Admin.*, 697 F.3d 604, 611 (7th Cir. 2012).

Here, State Defendants' potential expenditure of additional funds to fulfill an existing obligation does not weigh as heavily as the potential adverse consequences for Plaintiffs. Thus the balance of equities supports a preliminary injunction in this case.

### Factor 3:  The Proposed Preliminary Injunction
### Would Not Be Adverse to the Public Interest

A preliminary injunction would not be adverse to the public interest. The public interest is expressed in the Medicaid Act, providing that children are entitled to in-home medical care, to prevent the deterioration in their health and unnecessary institutionalization. State Defendants' violation of the Medicaid Act is contrary to this public interest. *See, e.g., Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019)("affordable access to competent health care" is in the public interest).

### Factor 4: There Is a Substantial Likelihood of Success on the Merits

A strong showing with regard to the factors of potential irreparable injury, balance of equities, and public interest decreases the need to show likelihood of success on the merits. *Okla. ex rel. Okla. Tax Comm'n,* 455 F.3d at 1113. In this circumstance, the moving party need only show "that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue for litigation and deserving of more deliberate investigation." *Id.* at 1113. Here, however, regardless what standard is applied, the factor of likelihood of success on the merits strongly favors Plaintiffs, both as to Plaintiffs' Medicaid claims and their disability discrimination claims.

### Plaintiffs and the Proposed Class Are Likely to Prevail
### on Their Claims under the Medicaid Act.

Plaintiffs are likely to show that State Defendants violated the Medicaid Act.

Plaintiffs' Ninth Cause of Action alleges that the Defendant failed to arrange for federally-mandated, medically necessary in-home nursing services for severely disabled children.  Doc. No. 1, page 547-48, ¶¶ 260-63.  This violation is clear from the undisputed facts.

*Plaintiffs Are Likely to Show*
*that State Defendants Violated the Medicaid Act's EPSDT Mandate.*

EPSDT requires Medicaid agencies to provide any service described in section 1396d(a) of the Medicaid Act if "necessary . . . to correct or ameliorate" illnesses or conditions, regardless whether they are covered under the State Plan for adults. 42 U.S.C. § 1396d(r)(5).  In-home nursing services are covered under EPSDT.  State Defendants must arrange for medically necessary, EPSDT-mandated services including in-home nursing. 42 U.S.C. § 1396a(a)(43)( C)("[A State plan for medical assistance must]…provide for…arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services.").

The Medicaid Act requires State Defendants to *proactively* arrange for EPSDT services and *assure* that those services are provided.  Each state must "[d]esign and employ methods to assure that children receive . . . treatment for all conditions identified as a result of examination or diagnosis . . . ." Centers for Medicare & Medicaid Services, *State Medicaid Manual*, CMS Pub. 45, Ch. 5, § 5310, *available at* https://www.cms.gov/Regulations-and-Guidance/guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.html; *see also Clark v. Richman*, 339 F. Supp. 2d 631, 646-47 (M.D. Pa. 2004)("[a state's] obligations with respect to EPSDT services require more proactive steps, such as actual provision of services . . . ."); *Chisholm v. Hood*, 110 F.

Supp. 2d 499, 507 (E.D.La. 2000)("[S]tates are further obligated to actively arrange for [EPSDT] corrective treatment" under Section 1396a(a)(43)( C)); *Salazar v. Dist. of Columbia,* 954 F. Supp. 278, 330 (D.D.C.1996) (District of Columbia's failure to ensure that EPSDT-eligible children receive diagnosis and treatment for health problems detected during screening violated Section 1396a(a)(43)( C). "These EPSDT requirements differ from merely providing 'access' to services; the Medicaid statute places affirmative obligations on states to assure that these services are actually provided to children on Medicaid in a timely and effective manner." *Memisovski ex rel. Memisovski v. Maram*, 2004 WL 1878332, at *50 (N.D. Ill. 2004), *citing Stanton v. Bond*, 504 F.2d 1246, 1250 (7th Cir.1974).

Here, for example, State Defendants have set up a capitated system of payment for Private Duty Nursing services; for the most part, the MCOs limit availability to nurses for whom they have already contracted, at a below-market rate. This effectively traps medically fragile children in a denial of services that results from a so-called "nursing shortage." State Defendants may not simply walk away from this denial of services:

> [Managed care organizations] can make or lose money depending on how the amount they receive in capitation funds compares to the amount of funding they provide recipients, but they must ensure that the services they provide comply with the terms of their contract with the State, *which itself must ensure that it complies with the terms of the Medicaid Act, [and] federal regulations . . . .*

*Waskul v. Washtenaw*, 979 F.3d 426, 437 (6th Cir. 2020)(emphasis added).

There was, at one point, a circuit split as to whether a state need only set up a payment plan to support access to services, or must itself ensure that the services themselves are in fact provided. For example, in *Bruggeman v. Blagojevich,* the Seventh

Circuit noted that Section 1396a(a)(8) "appears to have reference to financial assistance rather than to actual medical services" being provided.  324 F.3d 906, 910 (7th Cir. 2003).  In 2010, Congress corrected this judicial error, by amending the definition of "medical assistance" to address the circuit split.  Congress made crystal clear that the term "medical assistance" required the states to ensure medical services are provided:

> As part of its enactment Patient Protection and Affordable Care Act, Congress amended the definition of "medical assistance" under 42 U.S.C. § 1396d(a). As of March 23, 2010, "[t]he term 'medical assistance' means payment of part or all of the cost of the following care and services or the care and services themselves, or both[.]" 42 U.S.C. § 1396d(a) (2013). . . . [I]t appears that Congress intended to squarely address the circuit split and "to clarify that where the Medicaid Act refers to the provision of services, a participating State is required to provide (or ensure the provision of) services, not merely to pay for them[.]" *John B. v. Emkes*, 852 F.Supp.2d 944, 951 (M.D.Tenn.2012). Particularly edifying is the House Committee Report on the amendment which states, in relevant part:
>
>> ["Medical assistance"] is expressly defined to refer to payment but has generally been understood to refer to both the funds provided to pay for care and services *and to the care and services themselves*.... Some recent court opinions have, however, questioned the longstanding practice of using the term "medical assistance" to refer to both the payment for services and the provision of the services themselves. *These opinions have read the term to refer only to payment; this reading makes some aspects of the rest of Title XIX difficult and, in at least one case, absurd. If the term meant only payments, the statutory requirement that medical assistance be furnished with reasonable promptness "to all eligible individuals" in a system in which virtually no beneficiaries receive direct payments from the state or federal governments would be nearly incomprehensible.... To correct any misunderstandings as to the meaning of the term, and to avoid additional litigation, the bill would ... conform this definition to the longstanding administrative use and understanding of the term.*
>
> H.R.Rep. No. 111–299, pt. 1 at 649–50.

*Leonard v. Mackereth*, 2014 WL 512456, at *6–7 (E.D. Pa. 2014)(emphasis added); *see also DRNJ v. Velez*, 2010 WL 5055820, *3-4 (D.N.J. 2010)(new statutory definition of "medical assistance" under Section 1396d(a) and the legislative history thereof demonstrates that "'medical assistance' includes not only financial assistance but also

actual care or services").

This does not mean that the State must directly provide the medical services; of course, State Defendants may contract with others to provide services, much as the State contracts with private attorneys to comply with the State's obligations. This *does* mean, however, that a state must ensure that the services are provided, not merely agree to pay for services. In other words, State Defendants' duty to Medicaid beneficiaries remains a direct responsibility and a direct liability, enforceable via injunctive relief.

This is precisely what the Seventh Circuit held in a case that is nearly identical to the case presently before this Court. *O.B. v. Norwood,* 838 F.3d 837, 842–43 (7th Cir. 2016). In *Norwood,* the State argued that the federal court could not order the State to raise its reimbursement rates, and that all the State was required to do pursuant to the Medicaid laws was to pay for services. The Seventh Circuit disagreed, rejecting the notion that the State could "choose" between paying for services or providing services, essentially creating a permanent "gap" in services if no private provider meets the need for Private Duty Nursing services:

> [The State erroneously assumes] . . . that all that Medicaid requires of a participating state is payment for medical services, not the services themselves; that while the statute requires the state and hence HFS to "mak[e] medical assistance available" to the plaintiffs, 42 U.S.C. § 1396a(a)(10)(A), "medical assistance" just means either the provision of "the care and services" needed by the patient or the "payment of part or all of [their] cost." § 1396d(a). *In other words, the state argues that it gets to choose whether to pay for services or to provide services, though of course if it fails to provide services and no one fills the gap, it won't have to pay either.*

> *But in giving two meanings to "medical assistance" the statute need not be read to authorize HFS to decide which meaning shall govern in each case. In fact the statute can't be read so,* because, for example, it states that a "State plan for medical assistance must provide for ... arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services."

§ 1396a(a)(43)( C).  And remember that the Medicaid Act requires the state to provide the required services with reasonable promptness.

In arguing that all the Act requires of HFS is financial contribution, HFS relies on *Bruggeman*, 324 F.3d 906 at 910, which called "Medicaid ... a payment scheme, not a scheme for state-provided medical assistance." At that time the statute defined "medical assistance" only as "payment of part or all of the costs of" enumerated care. 42 U.S.C. § 1396d(a) (2009). But Congress amended this definition by the Patient Protection and Affordable Care Act in response to *Bruggeman* and the decisions that followed it. And as explained in *A.H.R. v. Washington State Health Care Authority*, 2016 WL 98513, at *12 (W.D. Wash. 2016), by doing this "*Congress intended to clarify that where the Medicaid Act refers to the provision of services, a participating State is required to provide (or ensure the provision of) services, not merely to pay for them.*"

*O.B. v. Norwood,* 838 F.3d 837, 842–43 (7th Cir. 2016) (emphasis added).  Finally, the

Seventh Circuit noted that "anomaly" of the State's estimate of the cost of ensuring

services at home, without having taken into account the higher cost of less integrated

settings. *Id.*

As noted by the Seventh Circuit in *Norwood,* beyond ensuring that medical

services are provided, State Defendants are required to arrange for these services with

"reasonable promptness"; their failure to do so also violates the Medicaid Act.  *See* 42

U.S.C. § 1396a(a)(8)(participating states must "provide that all individuals wishing to

make application for medical assistance under the plan shall have opportunity to do so,

and that such assistance shall be furnished with reasonable promptness to all eligible

individuals").  Judge Martha Vazquez has previously held that affected individuals may

bring a private cause of action to enforce Section 1396a(a)(8).  *See JL v. New Mexico*

*Dep't of Health*, 165 F. Supp. 3d 1048, 1063–64 (D.N.M. 2016).

There is no dispute that State Defendants found all named Plaintiffs and Class

members eligible for Medicaid-covered in-home nursing services.  However, although

State Defendants found specific amounts of nursing hours to be medically necessary for

all Plaintiffs, they have failed to provide adequate services for substantially more than 45

days, the accepted deadline to provide services. *See Edelman v. Jordan*, 415 U.S. 651,

654 (1974). "It is axiomatic that delays of several years are far outside the realm of

reasonableness." *Doe v. Chiles,* 136 F.3d 709, 717 (11th Cir. 2003).

State Defendants may attempt to defend themselves, as other states have, by

submitting, wrongly, that they have ensured that services will be provided by contracting

with the three MCOs, and that there is a nursing shortage that has blocked services.

Neither defense is availing.

First, as a matter of law, while State Defendants have the discretion to set up the

State's Medicaid program as they see fit, they remain liable to Medicaid recipients if the

program they choose does not, in fact, deliver the required services.

> [T]he Medicaid Act['s] . . . implementing regulations provide that, although the
> state can delegate authority to other entities to perform certain functions, the state
> Medicaid agency "may not delegate, to other than its own officials, the authority
> to supervise the plan or to develop or issue policies, rules, and regulations on
> program matters." 42 C.F.R. § 431.10©, (e). As the State acknowledges, courts
> have interpreted this regulation to mean that the state Medicaid agency remains
> *"legally responsible for problems with a state's Medicaid program*
> *notwithstanding delegations of authority to other state agencies or private*
> *parties." See, e.g., Catanzano v. Dowling*, 60 F.3d 113, 118 (2d Cir.1995)
> (affirming the district court's "persuasive reasoning" that "it is patently
> unreasonable to presume that Congress would permit a state to disclaim federal
> responsibilities by contracting away its obligations to a private entity").

*Wilson v. Gordon*, 822 F.3d 934, 953–54 (6th Cir. 2016)(emphasis added; some citations

omitted). Thus, as the court held in *Cota v. Maxwell-Jolly*, the State Defendants may not

"attempt to 'pass the buck' . . . to private entities to administer [Medicaid] services." 688

F. Supp. 2d 980, 997 (N.D. Cal. 2010).

> The public policy implications of [the] position [that a state may contract away its
> management of Medicaid], if accepted, would be devastating. It is patently unreasonable
> to presume that Congress would permit a state to disclaim federal responsibilities by

contracting away its obligations to a private entity.

*J.K. By & Through R.K. v. Dillenberg*, 836 F. Supp. 694, 699 (D. Ariz. 1993)(citations omitted).

Second, authorizing services but failing to provide adequate compensation to providers

runs afoul of the Medicaid Act: "A state may not circumvent a statutory duty . . . by

underfunding a mandatory Medicaid service to the degree that no health care practitioners can

afford to provide the service." *Health Care for All v. Romney*, 2005 WL 1660677, *10 (D.

Mass. 2005). State Defendants may not avoid their obligations to provide services with

reasonable promptness by merely "authorizing" services that are not actually provided for

months, if ever. Accordingly, Plaintiffs have a strong likelihood of success on this claim.

*Plaintiffs and the Class are Likely to Show*
*that State Defendants Violated the ADA and Section 504 of the Rehabilitation Act*

Plaintiffs' Sixth and Seventh Causes of Action allege that State Defendants have violated

the ADA and Section 504, prohibiting disability discrimination. 42 U.S.C. § 12132; 29 U.S.C. §

794(a)(Section 504); *see* Doc. No. 1, beginning on page 42, ¶¶ 222-246.

Pursuant to applicable regulations, State Defendants must administer services, programs,

and activities pursuant to the "integration mandate." *See* 28 C.F.R. § 35.130(d) (Title II); 28

C.F.R. § 41.51(d) (Section 504). The "integration mandate" requires State Defendants to

administer EPSDT in the "most integrated setting appropriate to the needs of qualified

handicapped persons." *Radaszewski v. Maram,* 383 F.3d 599, 607 (7th Cir. 2004); *see also M.R.*

*v. Dreyfus*, 697 F.3d 706, 709 (9th Cir. 2012)("The Supreme Court tells us that discrimination

against the disabled may occur when certain social services a state actually provides are found

only at nursing homes, and not provided at-home. Then the risk arises that the at-home disabled

must enter nursing homes, rather than remain at-home. That is discrimination under the ADA.").

The United States Supreme Court described the integration mandate in its landmark

*Olmstead* decision. *Olmstead v. L.C.,* 527 U.S. 581 (1999). The Court affirmed that integration into community life is a central aspect of the legislation prohibiting disability discrimination. *Id.,* 597. As described in *Olmstead,* a plaintiff relying on the integration mandate to show disability discrimination must show that: (1) treating professionals have found that the person can handle and benefit from a community setting; (2) the person wants to be in the community setting; and (3) community-based services can be reasonably accommodated taking into account the resources of the state and the needs of others with comparable disabilities. *Id.,* 601-03. Here, State Defendants, by authorizing private duty nursing services, have already established that Plaintiffs, as medically fragile children, require such services to remain in and benefit from a community setting.

A public entity may not defend on the basis that the discriminatory harm of institutionalization has not yet occurred. *Fisher v. Oklahoma Health Care Authority*, 335 F.3d 1175, 1181 (10th Cir.2003); *see also Cohon ex rel. Bass v. New Mexico Dep't of Health*, 646 F.3d 717, 729 (10th Cir. 2011). "*Olmstead* does not imply that disabled persons who, by reason of a change in state policy, *stand imperiled* with segregation, may not bring a challenge to that state policy under the ADA's integration regulation without first submitting to institutionalization." *Fisher*, 335 F.3d at 1182(emphasis added).

Moreover – and significantly for present purposes – isolation at home, away from participation in the surrounding community, may also be considered as a violation of the integration mandate. Thus "the question is whether Plaintiffs are provided services in the setting '*that enables [them] to interact with non-disabled persons to the fullest extent possible*.'" Waskul, 979 F.3d at 463 (emphasis added), *quoting Olmstead*, 527 U.S. at 592. Isolation at home, while not as dire as isolation in an institution, still violates the integration mandate:

> The Court [in *Olmstead*] had no occasion to consider whether the same evils it had identified for institutional placements might exist in some settings outside of an institution. This case presents that question: whether isolation in the home for a person

"who can handle and benefit from" time out in the general community is also inconsistent with the integration mandate. We see no reason why the same analysis should not apply. *See, e.g.*, Weber, Home and Community–Based Services, *Olmstead*, and Positive Rights: A Preliminary Discussion, 39 Wake Forest L. Rev. 269, 274 (2004) ("As with race discrimination, government-sanctioned separation transmits a strong message that the out-group is inferior and that private discrimination is acceptable."); Timothy M. Cook, The Americans with Disabilities Act: The Move to Integration, 64 Temp. L. Rev. 393, 441 (1991) (collecting studies concluding that "[t]he research data shows, without doubt ... that prejudice is lessened through integration"). Isolation in a home can just as "severely diminish[ ] the everyday life activities" of people with disabilities. *Olmstead*, 527 U.S. at 601. In fact, although family relations might be enhanced at home . . . , isolation in a home may often be worse than confinement to an institution on every other measure of "life activities" that *Olmstead* recognized.

*Steimel,* 823 F.3d 902, 910–11 (7th Cir. 2016)(some citations omitted); *see also Waskul*, 979 F.3d at 462 ("[W]e adopt *Steimel's* analysis and recognize that the isolation of individuals with disabilities in a home environment can also violate the integration mandate.").

The Tenth Circuit has also recognized that forced isolation in a community program may be just as discriminatory as the outright denial of access to public programs and services:

> . . . [W]e have held that the ADA requires public entitles to provide disabled individuals "meaningful access" to their programs and services. We therefore do not agree with Defendants that mere physical presence on the fairgrounds – at least when coupled with being effectively trapped in a handicapped section, unable to leave for food or to use the restroom, unable to view the stage, and subjected to being climbed over, stepped on, and bumped into by other attendees – amounts to anything other than a denial of the benefits of the fair.

*Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850, 857 (10th Cir. 2003).

## V.  Conclusion

State Defendants are required by the Medicaid Act and federal disability discrimination laws to provide private duty nursing services to Plaintiffs in the community.  As a matter of law, Plaintiffs are designed as "medically fragile children," at risk of deterioration in their health and ultimately institutionalization, if services are not provided.  Plaintiffs have provided undisputed facts to establish that the denial of these services is currently putting them at risk, and is

currently denying them full participation in their community. Plaintiffs are asking only that this Court order State Defendants to provide these services for which Plaintiffs are already qualified, as already required by law.

## VI.  Request for Relief

Plaintiffs pray that this Court grant their Motion for a Preliminary Injunction, as follows:

1.     Order State Defendants to return the administration of the EPSDT Program to the *status quo* that existed prior to the failure by HSD to provide the services mandated by the Individual Services Plans for Plaintiffs and the Plaintiff class.

2.     Order State Defendants to furnish and fulfill authorized private-duty nursing hours, directly or through referral to appropriate agencies, organizations, or individuals, to Plaintiffs and Class members;

3.     Award costs and attorney's fees and expenses as allowed by law; and

4.     Such other relief as this Court deems just and proper.

Respectfully submitted,

LAW OFFICES OF NANCY L. SIMMONS, P.C.

Nancy L. Simmons
Attorney at Law
120 Girard SE
Albuquerque, New Mexico  87106
(505) 232-2575

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via email/ECF electronic filing system this 6th day of October, 2022, to all parties of record.

Nancy L.  Simmons