**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

M.G., a minor and through
her mother, Christina Garcia, et al.,

      Plaintiffs,

v.                                                                    No. 1:22-cv-00325 MIS/DLM

DAVID SCRASE,[1] in his official capacity
as Secretary for the Human Services
Department of New Mexico, et al.,

      Defendants.

### MEMORANDUM OPINION AND ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

THIS MATTER is before the Court on Plaintiffs' Second Motion for Preliminary Injunction ("Motion"), ECF No. 150. Defendants responded, and Plaintiffs replied. ECF Nos. 176, 192. Both parties have also incorporated by reference parts of their prior briefing on Plaintiffs' First Motion for Preliminary Injunction, ECF No. 59. ECF Nos. 150 at 2, n.1 (incorporating by reference the declarations attached to ECF No. 59); 176 at 1 (incorporating by reference ECF No. 85). The Court issued an Order Directing Briefing on the current Motion, ECF No. 151, and the parties submitted a Joint Notice addressing the Court's Order, ECF No. 178, which included certain responsive documents. Plaintiffs have also submitted a Supplemental Response, ECF No. 195, and a Second Response, ECF No. 202, addressing changed circumstances. The Court held a hearing on Plaintiffs' First Motion for Preliminary Injunction, ECF No. 59, on November 4, 2022, and another hearing on the instant Motion on May 18, 2023. Having considered the parties'

---

[1] Since the filing of the Complaint, David Scrase has been replaced in his role at New Mexico Human Services Department by Acting Secretary Kari Armijo. *See* ECF No. 176 at 1 n.1.

submissions, the evidence presented, the arguments made by counsel, and the relevant law, the Court will **GRANT** the Motion **IN PART**.

## BACKGROUND

Plaintiffs are profoundly ill minor children who are classified as "medically fragile" under New Mexico's Medicaid program. *See generally* ECF No. 1. Plaintiffs' designation as "medically fragile" refers to the fact that each child has "a life threatening condition characterized by reasonably frequent periods of acute exacerbation, which require frequent medical supervision or physician consultation and which, in the absence of such supervision or consultation, would require hospitalization." Medically Fragile Home and Community-Based Services Waiver,[2] N.M. Human Servs. Dep't, 8.314.3.12(B)(1) NMAC. Plaintiffs' severe disabilities include—among others—difficulty breathing, frequent seizures, and the inability to feed themselves or go to the bathroom unassisted. ECF No. 1 at 24, 26–27, 29.

Plaintiffs' claims arise out of Defendants' alleged failure to provide them with adequate hours of private duty nursing ("PDN") services, despite Plaintiffs' each having already been approved for a certain number of hours by New Mexico's Medicaid program. ECF Nos. 1 at 2, 8; 48 at 2. The two surviving Plaintiffs remain at home with their families, who understandably refuse to have them institutionalized, as they do not wish to be separated from their children. *See generally* ECF Nos. 1, 150.

Plaintiff M.G. is a three-year-old girl who suffers from seizures and is dependent on a ventilator and a feeding tube. ECF No. 1 at 29. Her mother, Christina Garcia, works as a service

---

[2] Certain Medicaid home care programs are referred to as a "waiver" because, with express authorization by the relevant federal agency, the state is exempted from certain statutory requirements. *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1178 (10th Cir. 2003).

coordinator for New Mexico's Developmental Disabilities Waiver program and has worked in that field for twenty-two years. ECF No. 59-2 at 1. She adopted M.G. in 2020, after fostering her in 2019. *Id.* Many of M.G.'s disabilities result from illegal drug use during pregnancy by her biological mother, who is not involved in the case. *Id.* Ms. Garcia's full-time employment in public service is at constant risk due to M.G.'s lack of adequate PDN hours and the corresponding need for Ms. Garcia to care for her during normal working hours. *Id.* at 3.

Plaintiff C.V. is a three-year-old boy who suffers from medication-resistant seizures and is dependent on a feeding tube. ECF No. 1 at 26–27. C.V. can have over 50 seizures in a single day. ECF No. 59-7 at 2. C.V.'s parents, both law enforcement personnel, have submitted repeated requests for PDN services to the managed care organization with whom Defendants have contracted to provide these services, to no avail. ECF No. 1 at 27. C.V.'s parents allege that, due to the lack of PDN hours, they have been unable to earn income with which to better support C.V., stating that, for example, "C.V.'s mother had to give up a high-level position [as a federal agent] to take a lower paying position that provides more flexibility for leave, and has since used up all her earned leave." *Id.* at 28.

Due to the deficits in C.V.'s PDN hours, C.V.'s father, in turn, had initially planned to retire early from his position as a state police officer so he could be home with C.V. while his wife worked. ECF No. 59-7 at 5. However, in February 2022, he was shot in the line of duty and now suffers "[p]ain in his back, neck and shoulders," which has made it "extreme[ly] difficult[]" to pick up his child or attend to his needs, leaving the family in ongoing financial and caretaking need. *Id.*

Plaintiff A.C. was a ten-year-old girl who required "maximum assistance in basic living functions such as feeding, walking, toileting and bathing," and required "regular breathing assessments." ECF No. 1 at 24. She recently passed away after being hospitalized for a medical

emergency. *See* ECF Nos. 200, 203 (Suggestion of Death). Plaintiffs alleged that she had experienced "an average shortfall of 23.8 hours [of PDN] per week." ECF No. 1 at 25.

Plaintiffs assert that, in the absence of adequate PDN hours, they are at constant risk of life-threatening medical complications. ECF No. 1 at 26, 29, 31. For example, in the winter of 2022, C.V. lacked staff coverage for some of his approved nursing shifts. ECF No. 109 at 74. At that time, C.V.'s mother states that she was bottle feeding him and noticed "a runny nose, coughing, and some congestion," *id.*, which to most parents would indicate a common cold. However, it continued for months, until finally in the summer, a nurse was able to observe C.V.'s condition and recommended a swallow study, which revealed that C.V. is unable to safely take food by bottle at all due to the risk of aspiration (fluid entering the lungs). *Id.* at 73 –74.

Plaintiffs filed their Complaint on April 28, 2022, alleging that Defendants' failure to provide medically necessary PDN hours exposes Plaintiffs to "the risk of institutionalization or hospitalization," in violation of the Americans with Disabilities Act, the Rehabilitation Act, and the Patient Protection and Affordable Care Act, as well as "unnecessary isolation" as their families are not able to take them outside the home without assistance. *Id.* at 5.

On October 7, 2022, Plaintiffs filed their first Motion for Preliminary Injunction, asking that the Court enter an injunction requiring Defendants to provide them with adequate PDN hours. ECF No. 59 at 1. The Court denied Plaintiffs' first Motion for Preliminary Injunction, finding that the original language proposed did "not take into account either market factors or the steps Defendants have already taken to fulfill their legal obligations." ECF No. 136 at 6. The Court also found that the language of Plaintiffs' proposed injunction ran afoul of Rule 56 in that it was overly vague. *Id.*

After the close of the evidentiary presentations at the November 4, 2022 motion hearing, Plaintiffs provided the Court and Defendants with an alternative phrasing of the preliminary injunction. ECF Nos. 109 at 185–86; 135-2. The Court declined to consider this at that time on due process grounds but allowed Plaintiffs to file a renewed motion for preliminary injunction upon appropriate notice to Defendants. ECF No. 136 at 7.

Plaintiffs have since filed their renewed Motion, ECF No. 150, which asks that, among other things, the Court order Defendants to "take immediate and affirmative steps to arrange directly or through referral to appropriate agencies, organizations, or individuals, corrective treatment of in-home shift nursing services to Plaintiffs . . . at the level already approved by Defendants, as required by the Medicaid Act . . . ." ECF No. 150-3 at 2.

## LEGAL STANDARDS

### I.   Medicaid Regulatory Scheme

Medicaid directs federal funding to states, including New Mexico, to provide medical assistance to individuals who would not otherwise be able to afford healthcare. *See generally* 42 U.S.C. § 1396. States participating in Medicaid must designate a single state agency to administer and supervise the program and ensure compliance with the law. 42 U.S.C. § 1396a(a)(5). The chosen state agency may not delegate to others its "authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters." 42 C.F.R. § 431.10(e).

In New Mexico the New Mexico Human Services Department ("HSD") is the designated agency. *See* ECF Nos. 1 at 33; 18 at 3. HSD does not provide health services or monies directly to enrollees, but instead contracts with managed care organizations ("MCOs") to provide services. *See* ECF No. 1 at 2, 9; *see also* ECF No. 21. The Medicaid Act requires that a state Medicaid plan furnish healthcare services "with reasonable promptness to all eligible individuals," including

"private duty nursing services" to those living in their home communities, as opposed to uniformly requiring institutionalization for high-need patients. 42 U.S.C. §§ 1396a(a)(8), 1396d(a)(8). Indeed, one of the goals of the Medicaid program is to help people with disabilities to "retain [the] capability for independence . . . ." 42 U.S.C. § 1396-1.

## II.     Preliminary Injunction Standard

A party seeking preliminary injunctive relief pursuant to Federal Rule of Civil Procedure ("Rule") 65(a) must establish (1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the party opposing the preliminary injunction; and (4) the injunction would not be adverse to the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The issuance of preliminary injunctive relief is within the sound discretion of the district court. *See Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 354 (10th Cir. 1986). Every order granting a preliminary injunction must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B)–(C).

## DISCUSSION

Before addressing the four requirements for granting a preliminary injunction, the Court will analyze several initial matters raised by the parties.

## I.     Initial Matters

### A.  Whether the Requested Injunction Is Mandatory or Prohibitory

An injunction is mandatory, as opposed to prohibitory, if the requested relief affirmatively requires the nonmovant to act in a particular way and, as a result, places the issuing court in the position of ongoing supervision to ensure compliance. *Schrier v. Univ. Of Co.*, 427 F.3d 1253,

1261 (10th Cir. 2005). Mandatory preliminary injunctions are disfavored, as the general purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held, not to afford the movant all the relief they could recover at the conclusion of a full trial on the merits. *Id.* at 1258–59. In addition, mandatory preliminary injunctions are generally more difficult for courts to administer, as they require ongoing oversight.

"[A]ny preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). "When seeking a disfavored injunction, the movant 'must make a strong showing' both on the likelihood of success on the merits and on the balance of the harms." *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 884 (10th Cir. 2021) (quoting *O Centro*, 389 F.3d at 976).

Plaintiffs' updated proposed preliminary injunction asks that the Court order Defendants to "take immediate and affirmative steps to arrange directly or through referral to appropriate agencies, organizations, or individuals, corrective treatment of in-home shift nursing services to Plaintiffs . . . at the level already approved by Defendants, as required by the Medicaid Act . . . ." ECF No. 150-3 at 2. It also includes language directing Defendants to affirmatively provide notice to the MCOs of breach, to ensure the provision of PDN hours, and to provide certain class-related discovery to Plaintiffs. *Id.* at 2–3. The proposed language even includes a mechanism for ongoing Court monitoring. *Id.* at 3–4 ("Plaintiffs may file a written request for a status hearing before this Court, in order to clarify, provide comment regarding, or challenge the effectiveness of the steps Defendants have taken to arrange for in-home shift nursing services to Plaintiffs."). The Court thus

finds that Plaintiffs' proposed preliminary injunction is clearly mandatory. Therefore, Plaintiffs must meet a heightened burden to show their entitlement to relief.

### B.  Whether the Motion is a Motion to Reconsider

Defendants argue the instant Motion is a motion to reconsider and that the Court should deny it as there has been no intervening change in the controlling law, there is no new evidence, and there is no need to correct clear error or prevent manifest injustice. ECF No. 176 at 1, 7–8.

The Rules do not specifically contemplate motions to reconsider, but a court may vacate a final ruling under Rule 59 due to (1) an intervening change in the controlling law, (2) new evidence previously unavailable, or (3) the need to correct clear error or prevent manifest injustice. *Brumark Corp. v. Samson Resources Corp.*, 57 F.3d 941, 948 (10th Cir. 1995); *see BNSF Ry. Co. v. Lafarge Sw., Inc.*, 1:06-cv-1076 MCA/LFG, 2009 WL 10665755, at *3 (D.N.M. Feb. 21, 2009). However, orders "short of a final decree" may be reopened at the district judge's discretion. *Price v. Philpot*, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983)). This is because "district courts generally remain free to reconsider their earlier interlocutory orders." *Been v. O.K. Indus.*, 495 F.3d 1217, 1225 (10th Cir. 2007). The Rules provide in relevant part that

> any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b). This power is not subject to any particular standard or framework. *See XTO Energy, Inc. v. ATD, LLC*, 189 F. Supp. 3d 1174, 1190 (D.N.M. 2016) (reviewing case law).

Here, as noted by Plaintiffs, the Court has specifically permitted a renewed motion after denying Plaintiffs' First Motion for Preliminary Injunction on narrow grounds, including vagueness and due process concerns regarding the new proposed language. ECF Nos. 192 at 4–5; 136 at 6–7. Plaintiff's Motion, therefore, implicates the Court's power to reconsider interlocutory—rather than final—orders. The Court finds Defendants' arguments unavailing and will thus analyze Plaintiffs' entitlement to relief de novo and on the merits, and will not consider the Motion as one to reconsider.

To the extent that Plaintiffs' Motion could be construed as a motion to reconsider the issue of vagueness, the Court has reconsidered as discussed in Section VII below. *See also Been*, 495 F.3d at 1225; *Price*, 420 F.3d at 1167 n.9.

### C.  Admissibility of Evidence Produced

Next, Defendants object to Plaintiffs' alleged failure to produce admissible evidence. ECF No. 176 at 4, 8. However, as the Tenth Circuit has said, "[a] hearing for preliminary injunction is generally a restricted proceeding, often conducted under pressured time constraints, on limited evidence and expedited briefing schedules," and therefore, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). Defendants' arguments regarding the admissibility of Plaintiffs' evidence are thus unavailing. The Court will proceed to consider issues of standing.

### D.  Standing Issues

Defendants allege that Plaintiffs lack standing under Article III of the United States Constitution because their injury lacks true redressability, as "the record is uncontroverted that there simply are not enough PDN hours available in New Mexico." ECF No. 176 at 28.

To establish standing, Article III requires a plaintiff to show that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). In order to establish redressability, plaintiffs must allege clear and specific facts showing that it is likely that the relief sought will remedy plaintiffs' injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs, however, "need not show that a favorable decision will relieve [their] every injury." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (quoting *Larson v. Valente*, 456 U.S. 228, 244, n. 15 (1982)).

Here, Defendants do not dispute that Plaintiffs have alleged an injury in fact. *See generally* ECF No. 176. Instead, Defendants argue the complaint fails to allege facts plausibly suggesting that a favorable ruling would redress Plaintiffs' injuries. *Id.* at 27–31. This is because Defendants argue that the insufficient hours are solely due to the actions or inactions of independent third parties rather than Defendants. *Id.* at 29.

In fact, however, Plaintiffs suggest myriad ways in which Defendants could attempt to meet their obligations and redress Plaintiffs' alleged injuries. ECF Nos. 150 at 10–11; 192 at 7–8. Defendants also admit they have taken various steps to attempt compliance, even in the face of the nursing shortage. ECF No. 176 at 35–36. Additionally, as set forth more fully below, a shortage in and of itself is inadequate to show impossibility.

Indeed, M.G.'s mother was recently successful in finding her child additional nurses when Defendants were unable (or unwilling) to do so. ECF No. 150-2 at 2–3. The Court therefore finds Defendants' arguments regarding redressability to be unavailing. As set forth more fully below, determining what precise steps may be effective in complying with Defendants' legal obligations is a burden most equitably laid at the feet of Defendants.

Plaintiffs also ask that the Court recognize the associational standing of Plaintiff Disability Rights New Mexico, Inc. ("DRNM"). ECF No. 150 at 12–13. Defendants, without truly addressing this argument, allege that Plaintiffs attempt to circumvent class certification requirements. ECF No. 176 at 6. Because the updated injunction would not require that the Court recognize DRNM's associational standing, the Court declines to rule on this issue at this time.[3] *See United States v. Muhtorov*, 20 F.4th 558, 607 (10th Cir. 2021), *cert. denied*, 214 L. Ed. 2d 105, 143 S. Ct. 246 (2022) ("One limitation on the judicial power is the prohibition of advisory opinions . . . .").

The Court will now consider whether Plaintiffs have made the four-part showing that they are entitled to a preliminary injunction.

## II.      Whether Plaintiffs Have Demonstrated Irreparable Injury

Here, Plaintiffs argue that as Medicaid recipients they have no alternative to relying on Defendants for their medical needs, and that they live on the edge of medical crises. ECF No. 150 at 13. Plaintiffs further argue that their lack of PDN hours leaves them at risk of institutionalization, and subject to ongoing isolation in the home. *Id*. at 13–15.

Defendants argue that Ms. Garcia's allegations that M.G. received insufficient PDN hours in the past do not establish entitlement to a preliminary injunction, as the analysis depends instead on "her current and future circumstances." ECF Nos. 176 at 20; 85 at 15–17. Defendants also incorporate by reference several arguments from their prior briefing. ECF No. 176 at 20.

---

[3] The Court notes, however, that the District of New Mexico (Herrera, J.) has previously held in favor of DRNM on this exact issue. *See Waldrop v. New Mexico Hum. Servs. Dep't*, No. 1:14-cv-047 JH/KBM, 2015 WL 13665460, at *5 (D.N.M. Mar. 10, 2015).

Furthermore, to the extent that the Court has declined to order class certification-related discovery in the instant Order, the Court finds that Plaintiffs are likely already entitled to such discovery, unrelated to any alleged associational standing, and they are free to pursue it well in advance of timely filing their motion for class certification pursuant to the Court's May 19, 2023 Order. *See* ECF No. 216. The Court encourages the parties to reach out to the Magistrate Judge as early as possible regarding any discovery disputes related to class certification.

In particular, Defendants argue that there is no harm to Plaintiffs in missing PDN hours, as "[m]any services addressed in the [Individual Service Plans ("ISP")] can be and are being provided by an HHA." ECF No. 85 at 17–18. They maintain that the children's true medical needs are a moving target and cannot be shown by any evidence provided. *Id*. at 18 ("[T]he record contains no evidence on which the Court could find that a specific number of private duty nursing hours are medically necessary, as opposed to beneficial, desirable or eligible," for Plaintiffs.). They further contend that Plaintiffs are not denied access to the community, *id*. at 18, and indeed, they have no right to any more integrated setting than the family home, ECF No. 176 at 25. The Court will examine the evidence of each alleged type of irreparable harm in turn.

**A. The Risk of Immediate Medical Harm**

As noted above, Plaintiffs' uncontested designation as "medically fragile" refers to the fact that each child has "*a life threatening condition* characterized by reasonably frequent periods of acute exacerbation, which require frequent medical supervision or physician consultation and which, *in the absence of such supervision or consultation, would require hospitalization*." Medically Fragile Home and Community-Based Services Waiver, N.M. Human Servs. Dep't, 8.314.3.12(B)(1) NMAC (emphasis added). The Court, therefore, concludes there is no true dispute that the absence of required medical supervision results, per se, in a showing of a likelihood of irreparable injury on the basis of immediate medical harm. *See*, *e.g.*, *Beltran v. Myers*, 677 F.2d 1317, 1322 (9th Cir. 1982) ("Plaintiffs have shown a risk of irreparable injury, since enforcement of the [] rule may deny them needed medical care. That is a sufficient showing."). Plaintiffs have also produced voluminous credible evidence in the form of affidavits, testimony, and documentation from Defendants' own MCO partners that they are consistently not receiving their required hours. *See*, *e.g.*, ECF Nos. 59-2, 59-3, 59-4, 59-6, 59-7, 59-9; 109 at 68–69; 150-2.

In addition, in this case *in particular*, Plaintiffs have consistently demonstrated a high likelihood of irreparable injury in the absence of appropriate medical care. ECF Nos. 59-2 at 1 ("M.G. has a tracheostomy to maintain a clear airway, gastrostomy port in her stomach to receive fluids and nutrition, and is dependent on the use of a ventilator at home."); 59-7 at 2 (describing C.V.'s need for a gastronomy tube and how an average day includes "over 50 seizures a day" and he "needs a skilled person available to provide emergency services and rescue medications"); 109 at 26 (describing nurses' services as "vastly different" from those of HHAs, as they can provide medical interventions); 151 (HHAs cannot perform gastrostomy tube problem solving or home ventilator maintenance).

Plaintiffs are medically complex, to the point where even the most well-meaning parent would be unable to provide appropriate care on their own. *Id.* Plaintiffs have, for example, provided testimony regarding one of the Plaintiffs, C.V., showing what appeared to be cold symptoms because of what was later revealed by a nurse to be aspiration of milk from bottle feeding. ECF No. 109 at 74. Additionally, former Plaintiff A.C., who alleged "an average shortfall of 23.8 hours [of PDN] per week," ECF No. 1 at 25, passed away in early May, ECF No. 203.

Given the above, as well as the testimony at the May 18, 2023 hearing, the Court finds the Plaintiffs have made an incredibly strong showing of irreparable harm in the absence of their requested relief. Nevertheless, given the extraordinary nature of the relief requested, the Court will continue to analyze Plaintiffs' showing of the other types of alleged irreparable harm.

### B.  The Risk of Institutionalization

Notwithstanding the above, Defendants argue that Plaintiffs are not at imminent risk of institutionalization. ECF No. 176 at 25. Defendants contend that because Plaintiffs are not

currently institutionalized, the theoretical risk of institutionalization does not represent irreparable harm. *Id*.

As the Tenth Circuit has explained, however,

[t]he integration regulation [] states that public entities are to provide "services, programs, and activities in the most integrated setting appropriate" for a qualified person with disabilities. Those protections would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation.

*Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003) (citation omitted). Institutionalization may be considered a type of irreparable harm. *See*, *e.g.*, *M.R. v. Dreyfus*, 697 F.3d 706, 720 (9th Cir. 2012) ("We conclude that Plaintiffs have demonstrated a likelihood of irreparable injury because they have shown that reduced access to personal care services will place them at serious risk of institutionalization.")

Here, as mentioned above, Plaintiffs' uncontested designation as "medically fragile" refers to the fact that each child has "a life threatening condition characterized by reasonably frequent periods of acute exacerbation, which require frequent medical supervision or physician consultation and which, *in the absence of such supervision or consultation, would require hospitalization*." Medically Fragile Home and Community-Based Services Waiver, N.M. Human Servs. Dep't, 8.314.3.12(B)(1) NMAC (emphasis added); *see also* ECF Nos. 59-2 at 1 ("M.G. has a tracheostomy to maintain a clear airway, gastrostomy port in her stomach to receive fluids and nutrition, and is dependent on the use of a ventilator at home."); 59-7 at 2 (describing C.V.'s need for a gastronomy tube and how an average day includes "over 50 seizures a day" and he "needs a skilled person available to provide emergency services and rescue medications"). In fact, multiple Plaintiffs *have* been hospitalized during the pendency of this case, including former Plaintiff A.C.,

who has since passed. ECF Nos. 59 at 6, 59-2 at 2, 200 at 1. The Court therefore finds that Plaintiffs have made an adequate showing of irreparable harm via risk of institutionalization.

### C. Ongoing Isolation Within the Home

Plaintiffs also argue that in addition to the obvious consequences of denial of proper medical services—such as medical crises, institutionalization, and possible death—the denial of PDN hours results in isolation *in the home*. ECF No. 150 at 21.

Defendants argue that the PDN services are not available outside of Plaintiffs' homes or schools as a matter of law, that Plaintiffs have not shown a "more integrated" setting than their homes or schools, and that "Plaintiffs have not even attempted to show that the absence of PDN services has limited their ability to interact with the community outside of their homes and schools." ECF No. 176 at 26–27.

As set forth more fully below at Section V(B)(4), the Court believes that PDN services may be provided wherever Plaintiffs may happen to be. Additionally, contrary to Defendants' assertions, there is, in fact, ample testimony explaining what more integrated settings Plaintiffs desire and showing how the lack of PDN hours has limited Plaintiffs' ability to interact with the community.

For example, M.G.'s mother stated in her declaration that M.G. "has been prevented from attending school, where she accesses necessary educational supports and therapies, and has missed opportunities to engage in activities in her community because of her inability to access private duty nursing hours allocated to her in her [ISP]." ECF No. 59-2 at 2. Additionally, C.V.'s mother explained that:

> Without help, our family is isolated because we need someone available to monitor C.V. We frequently plan any family outing or errand around when a nurse is available so we can ensure C.V.'s safety. For example, a few months ago a nurse

helped monitor and clear C.V.'s airway during a routine car trip, which otherwise would have necessitated an unsafe vehicle maneuver to pull over and attend to him.

It is very difficult for us to go out and be part of the community which is a big detriment to C.V. Without a medically trained professional to attend to C.V., we are stuck in the home which isn't good for us or our children.

In addition, the community does not get to experience C.V. It is incredibly difficult to participate in an outing as a family without a nurse, even more so if I want my other child and C.V. to experience something together. With a nurse, I was able to visit the aquarium with both my children. I was able to help my other child use the restroom while our nurse attended to C.V. during a seizure. C.V. was able to be fed, taken out of his wheelchair and touch the glass. [C]hildren were able to see C.V., ask questions about his feeding tube, and experience something they had never seen before.

ECF No. 59-7 at 5 (paragraph numbers omitted). C.V.'s family's experience at the aquarium goes to the heart of the purpose of the integration mandate, which is not just to provide community involvement and enrichment to people with disabilities, but to reinforce their status as full and equal members of the community. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600–01 (1999) (Confinement in institutions is discrimination in part *because* it "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life."). The Court therefore finds that Plaintiffs have adequately demonstrated irreparable harm due to ongoing isolation within the family home.

### D.  Developmental Harms

Plaintiffs have testified they risk developmental harms in the absence of timely care. ECF Nos. 59-4 at 4; 59-2 at 2 (M.G. "requires regular engagement of family, skilled therapists, and nurses to maintain her range of motion and encourage skill acquisition and to meet developmental goals."); 59-7 at 4 ("C.V.'s developmental progress is inhibited without focused attention because we cannot always build in enough time to help him practice swallowing and walking, or to provide sensory activation, or ensure he has quality social interactions. Practicing clapping or learning how

to hold a spoon are huge milestones for C.V., and he progresses more slowly or not at all without individual care from a nurse.").

The Court shares Plaintiffs' concerns regarding development and quality of life, especially in view of the age of the minor Plaintiffs. *See Blackman v. D.C.*, 185 F.R.D. 4, 7 (D.D.C. 1999) (quoting *Foster v. District of Columbia,* Civil Action No. 82–0095, Memorandum Opinion and Order of February 22, 1982, at 4 (D.D.C.) (J.H. Green, J.)) ("Any agency whose appointed mission is to provide for the . . . welfare of children fails that mission when it loses sight of the fact that, to a young, growing person, time is critical. While a few months in the life of an adult may be insignificant, at the rate at which a child develops and changes . . . a few months can make a world of difference in the life of that child.").

Additionally, it is notable that one of the Plaintiffs has actually passed away during the pendency of this case. ECF No. 203. The risk of shortened life expectancy of Plaintiffs exemplifies the urgency of the surviving Plaintiffs' quality of life concerns. The Court finds Plaintiffs have met their burden to show irreparable harm in terms of lost quality of life and developmental progress.

**III.     Whether the Threatened Injury to Plaintiffs Outweighs the Injury to Defendants**

Plaintiffs argue that the above injury greatly outweighs any possible injury to Defendants, stating "the adverse consequences to the State are minimal" as "Plaintiffs are requesting services to which they are entitled." ECF No. 150 at 15. Defendants incorporate their earlier briefing by reference. ECF No. 176 at 20. Defendants' earlier arguments on this point, however, consist only of the following paragraph:

> Because Plaintiffs have not shown irreparable harm, the Court need not engage in a balancing test to determine whether the cost and disruption to HSD of trying to comply with an impermissibly vague injunction, see infra, that does not guarantee

any actual services for Plaintiffs (since HSD cannot create nurses and paying nurses more to serve the named Plaintiffs takes away nursing services from someone else) is outweighed by the harm to Plaintiffs.

ECF No. 85 at 19. Defendants therefore waive argument on this prong. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived . . . .").

As the Seventh Circuit stated in enforcing a different federal regulatory scheme, the Food Stamp Act, "[b]ecause the defendants are required to comply with the [] Act under the terms of the Act, we do not see how enforcing compliance imposes any burden on them. *The Act itself imposes the burden;* this injunction merely seeks to prevent the defendants from shirking their responsibilities under it." *Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986) (emphasis added). The Court finds the same logic applies here, and that this factor thus supports Plaintiffs' plea for relief.

Home care is expensive, and New Mexico is far from the richest state in the union. However, there is no federal mandate for Medicaid participation. *See Valdez v. New Mexico Hum. Servs. Dep't*, 6:05-cv-451 MV/ACT, 2006 WL 8444441, at *2 (D.N.M. Mar. 14, 2006) ("States are not required to participate in the Medicaid program, but once a state elects to participate, it must do so in accordance with federal statutes and regulations."). Furthermore, as mentioned at the May 18, 2023 hearing, the state receives three federal dollars for every one dollar it spends on Medicaid. As set forth more fully below at Section V(B), participation in the Medicaid program necessarily gives rise to the obligation to provide early and periodic screening, diagnostic and treatment ("EPSDT") services, including provision of PDN hours—not merely to offer to pay for them. Because the state has opted into the federal Medicaid program, it is required to comply with this obligation—in other words, providing these services is no additional burden on top of what

Defendants have already promised to do. Therefore, in light of Defendants' preexisting obligation to provide these services, the Court finds that the threatened injury to Plaintiffs greatly outweighs any possible injury to Defendants.

## IV.    Whether the Injunction Would Be Adverse to the Public Interest

Plaintiffs argue that enforcement of the Medicaid Act is in the public interest, as is providing "affordable access to competent health care." ECF No. 150 at 15 (quoting *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019)). Defendants' Response also incorporates by reference its Response to Plaintiffs' First Motion for Preliminary Injunction. ECF No. 176 at 20.

Defendants argue that judicial interference with the administration of the New Mexico Medicaid program is counter to the public interest as the planning and commitment of healthcare resources is "peculiarly within the province" of HSD. ECF No. 85 at 19–20. Defendants also contend that granting an injunction as to these Plaintiffs may negatively impact their other constituents, as "[t]here are only not many nurses in the State. HSD cannot magically conjure a nurse when one is needed. Yet, HSD is responsible for ensuring the provision of a wide array of medically necessary services to 976,955 Medicaid clients in New Mexico." *Id*. at 20.

Defendants have not presented a cost study showing that providing nurses for two children would bankrupt the state of New Mexico or even that it would be a substantial burden on the budget of HSD, thus potentially threatening the care of other equally needy patients. Indeed, at the recent hearing, counsel for Defendants appeared to admit that hiring traveling nurses to staff state hospitals may free up EPSDT-qualified nurses for home care positions, suggesting that there may already be mechanisms in place to provide relief.

As discussed below at Section V(B), Defendants are required by law to provide EPSDT services. Additionally, the Court believes that the tailored preliminary injunctive relief below will address Defendants' concerns regarding its autonomy and expertise in the state healthcare sector. For much the same reasons explained above under the injury prong, the Court finds that the requested relief would not be adverse to the public interest.

## V.  Whether Plaintiffs Have Demonstrated a Substantial Likelihood of Success on the Merits

### A.  Americans with Disabilities Act and Rehabilitation Act Claims

Title II of the Americans with Disability Act ("ADA") states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act similarly prohibits discrimination against qualified individuals "solely by reason of her or his disability." 29 U.S.C. § 794(a).

Defendants argue that Plaintiffs' theory of the case "does not fit within any ordinary understanding of 'discrimination.'" ECF No. 176 at 25. Defendants indicate that under their view, because "Plaintiffs receive more governmental aid than nondisabled persons," they are not subject to discrimination, as "[r]eceiving fewer hours than Plaintiffs believe they are entitled to does not constitute discrimination within the meaning of the ADA or the Rehabilitation Act." ECF No. 176 at 25 (quoting *Nasello v. Eagleson*, 977 F.3d 599 (7th Cir. 2020)).

This interpretation is belied by not only the history of disability discrimination law in this country, but the very history of discrimination law itself. *See Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.,* 347 U.S. 483, 495 (1954), *supplemented sub nom. Brown v. Bd. of Educ. of*

*Topeka, Kan.*, 349 U.S. 294 (1955) ("Separate [] facilities are inherently unequal."). In fact, the Supreme Court in *Olmstead* provided for a much more expansive definition of disability discrimination under the ADA, explaining:

> Ultimately, in the ADA, enacted in 1990, Congress not only required all public entities to refrain from discrimination; additionally, in findings applicable to the entire statute, Congress explicitly identified unjustified "segregation" of persons with disabilities as a "for[m] of discrimination."
>
> Recognition that unjustified institutional isolation of persons with disabilities is a form of discrimination reflects two evident judgments. First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life. Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.

*Olmstead*, 527 U.S. at 600–01 (1999) (citations omitted). The Court, therefore, held that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Id.* at 597. The requirement that public entities must therefore administer services in the "most integrated setting appropriate to the needs of qualified individuals with disabilities" is known as the "integration mandate." *See Fisher*, 335 F.3d at 1180. The Seventh Circuit in *Nasello*, cited by Defendants, did not substantively address the integration mandate. *See generally* 977 F.3d at 599.

Compliance with the ADA may well include the obligation to provide not just the *same* services to people with disabilities, but potentially *additional* services, to ensure that they can fully participate in society. *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002) ("[T]he Act specifies, namely, that preferen[tial treatment] will sometimes prove necessary to achieve the Act's basic equal opportunity goal. . . . By definition any special 'accommodation' requires the employer to treat an employee with a disability differently, i.e., preferentially.").

Defendants argue that unjustified isolation claims under *Olmstead* arise only where the issue is the location of services, not whether services will be provided. ECF No. 176 at 26. Here, notwithstanding Defendants' claims to the contrary, ECF No. 176 at 26, as discussed above, Plaintiffs have, in fact, repeatedly expressed the extreme difficulty faced when attempting to obtain care in their desired locations—both the family home and other community settings, *see*, *e.g.*, ECF Nos. 59-2 at 2; 59-7 at 5. As discussed above, the Court finds that both surviving Plaintiffs face a very real risk of institutionalization.

Although public entities are required to "make reasonable modifications in policies, practices, or procedures" in order to avoid the discrimination inherent in the unjustified segregation of the disabled, the "fundamental alteration regulation," relieves a public entity of its duties under the ADA's integration mandate if "the public entity can demonstrate that making the modifications would *fundamentally alter* the nature of the service, program, or activity." *Fisher*, 335 F.3d at 1181 (emphasis in original) (quoting 28 C.F.R. § 35.130(b)(7)).

Defendants have failed to present a fundamental alteration defense, and the Court does not immediately see how one would even be formulated, given that Plaintiffs have been approved for the hours they are demanding. *See generally* ECF No. 1. In any event, such defense has been waived for the purpose of this Motion. *See Adler*, 144 F.3d at 679; ECF Nos. 175, 176. Because Defendants' failure to provide Plaintiffs with PDN hours for which they have been approved presents an immediate risk that Plaintiffs be institutionalized, rather than remain at home with their families or retain access to the community, Plaintiffs have shown an adequate likelihood of success on their claim that Defendants have violated Title II of the ADA.

### B. Medicaid Act Claims

Defendants make various arguments regarding the "reasonable promptness" requirement in response to Plaintiffs' Motion. ECF Nos. 150 at 18–19; 176 at 22–24. Defendants are correct that "Plaintiffs' Complaint does not allege a violation of § 1396(a)(8) . . . ." ECF No. 176 at 22. The Court will therefore not address Plaintiffs' likelihood of success under that Section of the Medicaid Act.

Defendants also allege that the Eleventh Amendment provides immunity for suits alleging breach of contract under state law, and contend that Plaintiffs do not have standing to compel them to place their managed care organization partners with notice of a breach. ECF No. 176 at 18–19. However, Plaintiffs are not currently seeking a preliminary injunction on their breach of contract claims, so this concern is inapposite. ECF No. 150-3. In suggesting language requiring Defendants to alert MCOs of their breach, Plaintiffs appear to merely be suggesting ways other than raising reimbursement rates for Defendants to meet their obligations under the Medicaid Act to the two surviving Plaintiffs[4] in response to Defendants' arguments regarding *Armstrong*, which the Court will address separately below. *Id.* at 2.

### (1) Whether *Armstrong* Bars Plaintiffs' Medicaid Act Claims

Defendants argue that Plaintiffs' citation to 42 U.S.C. § 1396a(a)(43)(C) is a "misnomer" or red herring. ECF No. 176 at 21. Defendants argue that what Plaintiffs are truly seeking is for the Court to order Defendants to increase reimbursement rates under 42 U.S.C. §1396a(a)(30), which it claims is barred under *Armstrong*. *Id.* at 11–19.

---

[4] Plaintiffs do not, for example, suggest forcing Defendants to sue; it is perfectly possible, as Plaintiffs point out, that Defendants' managed care organization partners will choose to cure once they are made aware of a breach. *See* ECF No. 150-3; *see also* ECF No. 192 at 21. This possibility also augurs against Defendants' argument regarding timeliness of any redress. *See* ECF No. 176 at 19.

While the Court need not be fooled by a plaintiff's artful pleading, a plaintiff remains the master of his complaint. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). The Court agrees with Plaintiffs that "Defendants cannot hypothesize what *they* may have to do in order to ensure that Plaintiffs receive their allotted hours, and then bootstrap their hypothesis into an argument that this is what *Plaintiffs* 'really' want." ECF No. 192 at 9. Here, Plaintiffs are patients, not providers, and clearly seek the provision of needed medical services by any means required. *See generally* ECF No. 1. The Complaint makes no reference to Section (30)(a). *Id.*

Furthermore, the holding of *Armstrong* is significantly more cabined than Defendants indicate. Defendants state that *Armstrong* stands for the proposition that a private plaintiff cannot "bring a private claim to redress an alleged failure of HSD to set, whether directly or indirectly, sufficient reimbursement rates to ensure that the supply of private duty nurses equals the demand in the New Mexico marketplace." ECF No. 176 at 14 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 330–31 (2015)).

In short, it does not.

Section 30(A) of the Medicaid Act requires participating states to:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . .

42 U.S.C. § 1396a(a)(30)(A). In *Armstrong*, the Supreme Court considered the rights of providers of habilitation services to sue Idaho's Department of Health and Welfare on the basis that reimbursements *to providers* were lower than permitted by § 30(A). *Armstrong*, 575 U.S. at 323–24. The Supreme Court held that the Medicaid Act "implicitly preclude[d] private enforcement of

§ 30(A) . . . ." (1) because Congress had provided for enforcement of § 30(A) by way of the

Secretary of Health and Human Services withholding Medicaid funds, and (2) because of the

"judicially unadministrable nature of § 30(a)'s text." *Id.* at 328. The *Armstrong* Court explained

that

> [e]xplicitly conferring enforcement of this judgment-laden standard upon the
> Secretary alone establishes, we think, that Congress "wanted to make the agency
> remedy that it provided exclusive," thereby achieving "the expertise, uniformity,
> widespread consultation, and resulting administrative guidance that can accompany
> agency decisionmaking," and avoiding "the comparative risk of inconsistent
> interpretations and misincentives that can arise out of an occasional inappropriate
> application of the statute in a private action." The sheer complexity associated with
> enforcing § 30(A), coupled with the express provision of an administrative remedy,
> § 1396c, shows that the Medicaid Act precludes private enforcement of § 30(A) in
> the courts.

*Id.* at 328–29 (citations omitted).

Plaintiffs, however, are patients seeking care—not providers looking to pocket higher

reimbursement amounts—and are suing under different sections of the Act. ECF No. 1 at 47(citing

§§ 1396a(a)(10)(A), 1396d(a)(4)(B), and 1396a(a)(43)(C)). Defendants do not even begin to argue

either that these sections of the Medicaid Act are judicially unenforceable or that Congress

implicitly precluded private enforcement of these sections, and these potential arguments are thus

waived. *See Adler*, 144 F.3d at 679. Defendants argue only that Plaintiffs have failed to meet their

burden to show that they have the right to enforce the Medicaid Act provisions on which their

claim is based. ECF No. 176 at 17.

Defendants argue that the Tenth Circuit's decision in *Planned Parenthood of Kansas v.*

*Andersen* is distinguishable because there, the plaintiffs were "not merely contesting

reimbursement rates" while here, as in *Armstrong*, Plaintiffs are "expressly arguing that provider

reimbursement rates must be increased." ECF No. 176 at 16 (citing *Planned Parenthood of Kansas*

*v. Andersen*, 882 F.3d 1205, 1229 (10th Cir. 2018)). The Court disagrees; Plaintiffs' "primary claim" as beneficiaries is clearly for the life-saving healthcare for which they have been approved. *See generally* ECF No. 1. Indeed, Plaintiffs' proposed preliminary injunction includes absolutely no language regarding reimbursement rates. ECF No. 150-3.

Additionally, the briefing of both sides includes numerous other options to attempt in good faith to meet Defendants' obligations under the Medicaid Act. ECF Nos. 150 at 10–11; 176 at 35–36; 192 at 7–8. This belies Defendants' argument that "Plaintiffs have not identified any way HSD has failed to meet its alleged obligations with respect to furnishing PDN services," other than failing to increase reimbursement rates, ECF No. 176 at 16. As the Tenth Circuit explained in *Planned Parenthood*,

> . . . in *Armstrong*, the Supreme Court analyzed an entirely different section of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A), concluding that this specific section did not create a private right of action. Section 1396a(a)(30)(A) provides that "[a] State plan for medical assistance must . . . provide such methods and procedures relating to the utilization of, and the payment for" Medicaid services to ensure that Medicaid pays for only necessary, efficient, economic, and high-quality care while still setting reimbursement rates high enough to encourage providers to continue serving Medicaid patients. In his opinion, the last portion of which Justice Breyer declined to join, thus making that portion a plurality, Justice Scalia stated that "Section 30(A) lacks the sort of rights-creating language needed to imply a private right of action." *But the plaintiffs there did not sue under § 1983 to enforce a right established by the Medicaid Act*. . . . Justice Scalia also noted [in the nonbinding plurality section of] *Armstrong* that the plaintiffs were providers, as opposed to the providers' patients, who are the Medicaid Act's intended beneficiaries. As such, he doubted "that providers are intended beneficiaries (as opposed to mere incidental beneficiaries) of the Medicaid agreement." Indeed, the majority speculated that the provider-plaintiffs in *Armstrong* likely chose not to sue under § 1983 *because they had no unambiguously conferred right* under *Gonzaga*.

*Planned Parenthood of Kansas*, 882 F.3d at 1226 (emphasis added) (citations omitted). *Armstrong* is therefore inapposite.

### (2) Whether EPSDT Patients Have a Private Right of Action

Finally, Defendants argued at the hearing held on May 18, 2023, and in their brief, that the sections of the Medicaid Act under which Plaintiffs sued do not state a private right of action. *See* ECF No. 176 at 17. As discussed above, the logic of the Supreme Court in *Armstrong* does not apply to the instant case. *See supra* at V(B)(1). Instead, whether there exists a private right of action is determined by the *Blessing*/*Gonzaga* test.

Section 1983 imposes liability on anyone who under color of state law deprives a person of "rights, privileges, or immunities" secured by the laws or the Constitution of the United States. 42 U.S.C. § 1983. In *Blessing v. Freestone,* the Court set forth three criteria to determine whether a statutory provision gives rise to a federal right under 42 U.S.C. § 1983:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

520 U.S. 329, 340–41 (1997) (citations omitted). In *Gonzaga Univ. v. Doe,* the Supreme Court further held that an enforceable private right exists only if the statute contains nothing "short of an unambiguously conferred right" and not merely a vague benefit or interest. 536 U.S. 273, 283 (2002). No enforceable right exists "where a statute by its terms grants no private rights to any identifiable class." *Id.* at 283–84. A statute unambiguously demonstrates congressional intent to confer individual or personal rights by using "rights-creating language," *id.* at 287, which must clearly impart an "individual entitlement," and have an "unmistakable focus on the benefited class," *id.* at 284. "Once a plaintiff demonstrates that a statute creates a federal right, the right is presumptively enforceable under § 1983 unless Congress specifically foreclosed such a remedy."

*Mandy R., Mandy R. v. Owens,* 464 F.3d 1139, 1147 (10th Cir. 2006), *cert. denied*, 549 U.S. 1305 (2007) (citing *Gonzaga,* 536 U.S. at 284); *see also JL v. New Mexico Dep't of Health*, 165 F. Supp. 3d 1048, 1061–63 (D.N.M. 2016).

Generally, under the EPSDT program, a state must provide all forms of medical assistance to Medicaid patients under the age of 21. *See* 42 U.S.C. § 1396d(r)(5) (defining services). "The EPSDT obligation is thus extremely broad." *Katie A., ex rel. Ludin v. L.A. Cty*., 481 F.3d 1150, 1154 (9th Cir. 2007). States must provide all of the services listed in 42 U.S.C. § 1396d(a) to eligible children when such services are found to be medically necessary, including "private duty nursing services." *See* 42 U.S.C. § 1396d(a)(8). As noted by Judge Vazquez, "[s]tates are not required to participate in the Medicaid program, but once a state elects to participate, it must do so in accordance with federal statutes and regulations." *Valdez*, WL 8444441, at *2 (citing 42 U.S.C. § 1396a(a)(10)).

Here, there is no credible dispute that HSD has determined that Plaintiffs are eligible for Medicaid benefits and PDN services, and the Court finds Plaintiffs have shown a strong likelihood that there are shortfalls in the provision thereof. *See*, *e.g*., ECF Nos. 59-2, 59-3, 59-4, 59-6, 59-7, 59-9, 109 at 68–69, 150-2. The only question is whether such failure by Defendants to provide full EPSDT services gives rise to a private cause of action.

Various courts have already recognized a private right of action to enforce a Medicaid patient's right to EPSDT services. *See*, *e.g*., *Salazar v. D.C.*, 729 F.Supp.2d 257, 268 (D.D.C. 2010); *S.D. ex rel. Dickson v. Hood,* 391 F.3d 581, 607 (5th Cir. 2004); *Pediatric Specialty Care, Inc. v. Arkansas Dept. of Human Services,* 293 F.3d 472, 479 (8th Cir. 2002); *Westside Mothers v. Haveman,* 289 F.3d 852, 863 (6th Cir. 2002); *S.R. by & through Rosenbauer v. Pennsylvania Dep't of Hum. Servs*., 309 F. Supp. 3d 250, 262 (M.D. Pa. 2018); *William v. Horton*, 2016 WL 6582682,

*6 (N. D. Ga. Nov. 7, 2016); *J.E. v. Wong*, 125 F. Supp. 3d 1099, 1108 (D. Haw. 2015); *John B. v. Emkes*, 852 F.Supp.2d 944, 948 (M.D. Tenn. 2012), *aff'd* 710 F.3d 394 (6th Cir. 2013); *see also O.B. v. Norwood*, 838 F.3d 837, 843 (7th Cir. 2016) (upholding patients' preliminary injunction).[5] This Court now joins them.

First, EPSDT services include screening services—which must include a comprehensive health and development history, a comprehensive unclothed physical exam, appropriate immunizations, laboratory tests, and health education—vision services, dental services, hearing services, and "such other necessary health care, diagnostic services, treatment, and other measures . . . to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r). These services were clearly intended to benefit minor patients such as Plaintiffs. Plaintiffs do not merely fall within the general zone of interest that the statute is designed to protect, but instead comprise a specific class of individuals intended to receive services under this provision. *See Gonzaga*, 536 U.S. at 283.

Second, the Court finds this obligation is not so ambiguous or amorphous that its enforcement strains judicial competence, as the mandated services are described in detail. Third, the relevant statutory language is mandatory; Section 1396a(a)(10)(A) states that EPSDT services "must" be included, as does Section 1396a(a)(43). The Court therefore holds that the EPSDT mandate satisfies the three-part *Blessing* test, as clarified by *Gonzaga*, and thus confers upon

---

[5] *See also Watson v. Weeks*, 436 F.3d 1152, 1162 (9th Cir. 2006) (finding a similar private right of action under the Medicaid Act); *Sabree ex rel. Sabree v. Richman,* 367 F.3d 180, 183 (3d Cir. 2004) (same); *Miller by Miller v. Whitburn,* 10 F.3d 1315, 1319–20 (7th Cir. 1993) (applying the pre-*Blessing*/*Gonzaga* test under *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 509 (1990) to find the same private right of action).

Plaintiffs and other EPSDT patients a private right of action. *Blessing*, 520 U.S. at 340–341; *Gonzaga*, 536 U.S. at 283.

### (3) Whether Defendants Are Required Merely to Pay For Services Instead of Ensuring the Provision of Services

At the May 18, 2023 hearing, Defendants also argued that their obligations under the Medicaid Act are fulfilled by payment alone. In arguing that all the Act requires of HSD is financial contribution, Defendants relied on *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906 (7th Cir. 2003), which—as noted by Plaintiffs' counsel—has since been superseded by statute. The *Bruggeman* court called "Medicaid . . . a payment scheme, not a scheme for state-provided medical assistance." 324 F.3d at 910. At the time of *Bruggeman*, the statute defined "medical assistance" only as "payment of part or all of the costs of" enumerated care. 42 U.S.C. § 1396d(a) (2009).

As noted by Plaintiffs in their Motion and at the May 18, 2023 hearing, however, Congress has long since amended this definition. *See* ECF No. 150 at 18. As part of the Patient Protection and Affordable Care Act, Congress amended the definition of "medical assistance" under 42 U.S.C. § 1396d(a) to clarify that the term "medical assistance" means "payment of part or all of the cost of the following care and services *or the care and services themselves, or both . . . .*" 42 U.S.C. § 1386d(a) (emphasis added). As other courts have found, it appears that Congress intended "to clarify that where the Medicaid Act refers to the provision of services, a participating State is required to provide (or ensure the provision of) services, not merely to pay for them . . . ." *A. H. R. v. Washington State Health Care Auth.*, 469 F. Supp. 3d 1018, 1040 (W.D. Wash. 2016) (quoting *John B.*, 852 F. Supp. 2d at 951); *see also C.A. through P.A. v. Garcia*, No. 4:23-CV-00009 SHL/HCA, 2023 WL 3479153, at *6 (S.D. Iowa May 15, 2023); *Norwood*, 838 F.3d at 843;

*Murphy by Murphy v. Minnesota Dep't of Hum. Servs.*, 260 F. Supp. 3d 1084, 1108 (D. Minn. 2017); *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1321 (W.D. Wash. 2015); *Leonard v. Mackereth*, No. CIV.A. 11-7418, 2014 WL 512456, at *6 (E.D. Pa. Feb. 10, 2014). For these reasons, the Court finds Defendants' arguments unavailing.

### (4) Whether Plaintiffs Were Required to Administratively Exhaust

Defendants imply that Plaintiffs were required by the Medicaid Act to exhaust their administrative options prior to filing in federal court. ECF No. 176 at 6. "Under the Medicaid statutes and regulations, Medicaid recipients may request a fair hearing, request a continuation of their benefits pending the outcome of the fair hearing, and appeal the final agency decision to the state district court." *Valdez*, 2006 WL 8444441, at *5. A plaintiff, however, is not required to exhaust administrative remedies prior to filing under § 1983. *Porter v. Nussle*, 534 U.S. 516, 523 (2002); *see also J. G. through Grimes v. Bimestefer,* No. 21-1194, 2022 WL 2965794, at *7 (10th Cir. July 27, 2022); *see* ECF No. 1 at 48. Therefore, Defendants' arguments regarding the fair hearing are unavailing.

### (5) Which Document Determines Defendants' Right to PDN Hours

The Court's Order Directing Briefing instructed the parties to state which document determines individual Plaintiffs' rights to a specific number of PDN hours under the Medicaid Act and to provide certain documents. ECF No. 151 at 3. The Court has reviewed the documentation submitted. Plaintiffs argue that the ISP reflects Plaintiffs' rights to PDN services under the Medicaid Act as medically fragile children, as the need for skilled nursing services must be included in the ISP under New Mexico regulations. ECF No. 192 at 26–27. Plaintiffs state that the EPSDT budgets "do not necessarily reflect what rights EPSDT beneficiaries have," instead only

documenting the approved level of care and what services have been approved for payment by Defendants. ECF No. 192 at 26.

Defendants agree that "the PDN services must be specified in the EPSDT beneficiary's treatment plan, or ISP in this case." ECF No. 176 at 31. Defendants point out that the EPSDT Budget is the document that "identifies the specific home health provider eligible to render services and allocates the total number of in-home skilled caregiving hours for which a child is eligible . . . between the PDN services, if any, and HHA providers or therapists that have agreed to provide services." ECF No. 176 at 33. Defendants allege that these numbers do not necessarily represent true medical necessity, however, stating that family preferences can "override" the care manager and allocate all of the skilled care services in their EPSDT budget to PDN. ECF No. 176 at 34.

The Court observes that PDN hours are only clearly disaggregated in the EPSDT budgets. *Compare* 202-1 at 1 *with* 202-3.

Given the above, and based on the Court's own examination of the documents submitted, for purposes of judicial clarity and enforcement of the below injunction, the Court provisionally holds that there will be a rebuttable presumption of entitlement to the PDN hours specified in the EPSDT budget. Such presumption may be rebutted by good cause shown, including, for example, an affidavit by the care manager that PDN services are not medically necessary for a given child at the level represented by the EPSDT budget, an affidavit showing increased need in between regular periodic assessments, or other changed circumstances. In the event that one side seeks to rebut this presumptive entitlement, the other side will have the right to submit evidence in their favor in reply, including, for example, provider testimony. The Court reserves the right to update this determination at any time as the case proceeds.

### (6) Whether Medicaid-funded PDN Hours Must Be Provided in the Home

Finally, Defendants argue that a New Mexico regulation does not allow Plaintiffs to receive PDN services in locations other than Plaintiffs' homes or schools. ECF No. 176 at 27 (citing NMAC § 8.320.2.19(B)). Plaintiffs, meanwhile, contend that this represents a misinterpretation of New Mexico regulatory framework, maintaining that these two locations for services are non-exclusive, but are instead merely examples of different locations services may be provided. ECF No. 192 at 13.

The state statute does indeed state that "PDN services must be furnished by a [Registered Nurse] or a [Licensed Practical Nurse] in the [New Mexico medical assistance program] eligible recipient's home or in his or her school setting if it is medically necessary for school attendance."[6] NMAC § 8.320.2.19(B). Even prior to *Olmstead*, courts interpreted similar *federal* regulations on private duty nursing as setting-independent. As explained by the Second Circuit,

> Two and a half decades ago it may have been widely accepted that a person needing the services of a private duty nurse would be confined to a hospital, a skilled nursing facility, or the four corners of her home, but fortunately these assumptions no longer hold true today. . . . private duty nursing is now commonly understood to be "setting independent"; that is, it refers to a level of care rather than to specific locations where the care can be provided. . . . Because the secretary's explanation for his narrow interpretation of [the regulation] depends on a static and obsolete view of the relevant facts, we do not accept it as reasonable.

*Detsel by Detsel v. Sullivan*, 895 F.2d 58, 64 (2d Cir. 1990) (construing a statute which clearly identified the home, a hospital, or a skilled nursing facility as acceptable locations for provision of

---

[6] Defendants cite *Shook v. Bd. of Cnty. Commissioners of Cnty. of El Paso*, 543 F.3d 597, 606 (10th Cir. 2008), in their argument regarding vagueness, stating that Plaintiffs fail to define "appropriate" providers of PDN. ECF No. 176 at 11. Elsewhere in their briefing, however, they indicate their awareness of the qualifications required, stating that "EPSDT PDN 'services must be furnished by a RN or a LPN . . . .'" ECF No. 176 at 27. The Court will not address this argument further as it appears the parties are in agreement. *See* ECF No. 192 at 9 (Qualifications for "appropriate providers of PDN" are "pre-set by regulation").

PDN services). Modernly, the National Center for Medicaid and State Operations "specifically instructs that a homebound requirement is an improper restriction for the provision of any home health care service." *Lankford v. Sherman*, 451 F.3d 496, 512 (8th Cir. 2006); *see also* Medicaid Program; Face-to-Face Requirements for Home Health Services; Policy Changes and Clarifications Related to Home Health, 81 FR 5530-01 and 76 FR 41032-01; *Skubel v. Fuoroli*, 113 F.3d 330, 337 (2d Cir. 1997) ("[W]e find no logical basis to support restricting Medicaid funding to home nursing services provided exclusively at the recipient's place of residence."); *Hatten-Gonzales v. Earnest*, 1:88-cv-00385 KG/CG, 2016 WL 9781212, at *3 (D.N.M. July 15, 2016), *report and recommendation adopted*, 2016 WL 9779421 (D.N.M. Sept. 27, 2016), *quashed*, 2018 WL 6573455 (D.N.M. Dec. 13, 2018) (noting prior agreement by HSD to revise the New Mexico Administrative Code "in order to bring it into compliance with federal regulations governing [] Medicaid").

For the foregoing reasons, the Court finds that Plaintiffs' interpretation of the controlling regulatory framework is more likely to prevail.

## VI.    Defendants' Impossibility Argument

While Defendants now frame their "impossibility" argument as challenging Plaintiffs' standing for lack of redressability, *see supra at (I)(D)*, the Court will also separately address their argument that it is impossible to comply with their obligations under the Medicaid Act, given the current market conditions. ECF No. 176 at 27–31. Defendants contend they should be excused from compliance because there are simply not enough qualified nurses working in New Mexico. *Id*. at 28. As the Court indicated at the first motion hearing, however, there are obvious factors that may cause a person to change jobs, even across state lines. Additionally, the below injunction does not require perfect compliance with the EPSDT mandate; it requires good faith efforts. *See* ECF

No. 85 at 8 ("The gulf between an injunction mandating that services actually be delivered . . . and an injunction requiring the state to 'take steps' to locate and arrange for nursing services . . . is massive.").

As Defendants urge, the Court will take judicial notice of a nursing shortage. The Court will *not* agree that a nursing shortage ends the inquiry into Defendants' clear obligation under federal law to provide services. Defendants' laudable efforts to ameliorate the shortage, unfortunately, undercut Defendants' own argument that there exist no steps that *may* be taken to combat a shortage. Additionally—and fatally—Defendants have not shown evidence *connecting* the nursing shortage with their own resources. For example, there was no expert testimony at either hearing regarding how broad the nursing shortage is, what it means for this small number of Plaintiffs, or whether hiring traveling nurses would bankrupt Defendants—or even substantially impact them.

Defendants concede that the Medicaid act "provides a general requirement that the state arrange for medically necessary, EPSDT-mandated services," but argue "that requirement is not unlimited, and necessarily assumes that such services are available." ECF No. 176 at 21. Defendants give the example that "a Medicaid plaintiff requiring a heart transplant cannot bring a claim under §(a)(43) to require the State to procure a heart where no [] transplants are available . . . ." *Id.*

While a seemingly common-sense statement, Defendants do not provide any authority for this assertion, and the Court wonders at the implicit comparison of nurses to human hearts. As an example, while the organ trade remains illegal despite the best efforts of certain civil libertarians, nurses are likely to accept jobs in exchange for higher wages or better working conditions, or in response to greater outreach. The comparison is thus not well-taken. Additionally, even if the two

shortages were comparable, the Court notes that governments in fact commonly take steps to encourage organ donation, such as outreach, education, and affirmatively asking residents whether they consent to donate organs during driver's license registration.

There are a limited number of families in the state of New Mexico alleged to be lacking in PDN hours—around fifty. ECF No. 1 at 12; *see also* ECF No. 85 at 15. At issue currently are only two. The Court doubts that it would bankrupt HSD to hire traveling nurses sufficient to displace otherwise qualified home care nurses from hospital positions, resulting in the sufficient staffing of the two surviving Plaintiffs' households. Though the question is not currently before the Court, the Court suspects the same would be true for even fifty similarly situated New Mexican children.

A nursing shortage, alone, is not an impossibility. As Plaintiffs indicate, economic shortages can vary regionally, including the nationwide post-covid nursing shortage. *See* ECF No. 192 at 15. Such shortages can be combatted. For example, if there were a local nursing shortage but a neighboring state had a surfeit of trained nurses, Defendants would likely be lax in their duties under the Medicaid Act not to try and attract some of these available and appropriately trained nurses to the state of New Mexico.

While Defendants may not possess a solution to the nationwide shortage, Defendants bear no such burden; Defendants have a duty, instead, to provide certain basic services to New Mexico Medicaid recipients. Whether this entails increased out-of-state advertising, creative problem-solving in collaboration with its MCO partners, or other affirmative steps is the province of Defendants' sound judgment as healthcare administrators. *See* ECF No. 85 at 23 ("Wages are only part of a bigger economic equation."). Defendants' difficulty in finding and retaining qualified nurses is just that—a difficulty, not an impossibility. Indeed, M.G.'s mother has recently shown

that applying increased effort to the problem can result in relatively immediate positive results. ECF No. 150-2 at 2–3.

As Plaintiffs note in the Complaint, New Mexico's Medicaid program works via "capitated payments," as opposed to fee-for-service, meaning that when care is more expensive, the MCOs lose money, and when care is less expensive, the MCOs profit. ECF No. 1 at 2. The nature of this type of risk-based contract means that, in theory, if providing care were to become more expensive due to an unexpected mid-contract shortage, the MCOs would simply lose money—not be allowed to provide fewer services. In the longer term, it might result in the MCOs renegotiating their renewal contracts. It does not, on its own, result in the responsible state agency being legally excused from providing required services.

As Defendants note, the ability to provide services is impacted by market conditions. ECF No. 176 at 27. However, Defendants are also market participants, and are not without the power to take steps to enforce their own contracts. Here, there is no evidence they have taken even first step to do so. The Court does not doubt that many of Defendants' employees are doing their very best to find nurses. *See*, *e.g.*, ECF Nos. 59-3; 59-6 at 2; 59-9; 85-1 at 2–3; 109 at 37–38. But without greater support from higher levels of HSD, there may be only so much frontline care coordinators are able to achieve for the individual patients and families they serve.

To be sure, the purpose of the Medicaid program is to furnish medical assistance "as far as practicable" to eligible individuals. 42 U.S.C. § 1396-1. Indeed, courts may consider the practicality of compliance even when a defendant's flouting of its legal obligations is obvious. *See*, *e.g.*, *Blackman v. D.C.,* 185 F.R.D. 4, 5 (D.D.C. 1999) ("The Court has not issued a broad, class-wide preliminary injunction . . . [because] the District simply does not have the resources to come into immediate compliance."); *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 614 (7th

Cir. 2004) ("A court must therefore take care to consider the cost of a plaintiff's care not in isolation, but in the context of the care it must provide to all individuals with disabilities comparable to those of the plaintiff."); *Olmstead*, 527 U.S. at 597 ("In evaluating a State's fundamental-alteration defense, the District Court must consider, in view of the resources available to the State, not only the cost of providing community-based care to the litigants, but also the range of services the State provides others with mental disabilities, and the State's obligation to mete out those services equitably."). For these reasons, if it were a question of a *permanent* injunction as to *all* eligible children in New Mexico, the Court's analysis might differ.

Here, however, the injunction requested is preliminary, not permanent, and the surviving Plaintiffs constitute two disabled children in a state of nearly a million Medicaid beneficiaries. ECF No. 85 at 20; *see also* ECF Nos. 85 at 12 (alleging 195 children in New Mexico's Medically Fragile waiver program); 1 at 12 (alleging "at least fifty three" children in New Mexico eligible for PDN hours but not receiving all of them). The Court therefore finds Defendants' "impossibility" argument unavailing.

Under Rule 65(a), Plaintiffs normally must show a "substantial" likelihood of success on the merits. *Winter*, 555 U.S. at 20. Even under the heightened standard for a disfavored mandatory injunction, Plaintiffs need not show a *perfect* likelihood of success on the merits, merely a strong one. *State v. U.S. Env't Prot. Agency*, 989 F.3d at 884; *O Centro Espirita Beneficiente Uniao Do Vegetal*, 389 F.3d at 976. The Court finds that Plaintiffs have made the requisite showing.

## VII.    Whether the Injunction Is Impermissibly Vague

In their First Motion for a Preliminary Injunction, Plaintiffs asked that the Court grant a preliminary injunction "[o]rder[ing] State Defendants to return the administration of the EPSDT Program to the *status quo* that existed prior to the failure by HSD to provide the services mandated

by the Individual Services Plans for Plaintiffs and the Plaintiff class" and "[o]rder[ing] State Defendants to furnish and fulfill authorized private-duty nursing hours, directly or through referral to appropriate agencies, organizations, or individuals, to Plaintiffs and Class members . . . ." ECF No. 59 at 27.

> Defendants argued, among other things, that

> Court[-]ordered provision of nursing services will necessitate the medical providers to try to pull nursing staff from other patients in hospital, clinic and other in home care settings to provide [plaintiffs] with the maximum numbers of hours of in home care for which they claim they are eligible at the expense of other New Mexicans. A court is not in the position to make the medical decisions regarding the allocation of nurses, a scarce resource, among sick New Mexicans.

ECF No. 85 at 21.

"[G]enerally, injunctions simply requiring the defendant to obey the law are too vague." *Keyes v. Sch. Dist. No. 1*, Denver, Colo., 895 F.2d 659, 668 (10th Cir. 1990). This is because, at least in part, a "sweeping injunction to obey the law" does not adequately inform a defendant of her obligations. *Swift & Co. v. United States*, 196 U.S. 375, 401 (1905). In order to satisfy Rule 65, the language of a preliminary injunction must be specific enough for the Court to determine whether there is compliance. *Shook v. Bd. of Cnty. Commissioners of Cnty. of El Paso*, 543 F.3d 597, 606 (10th Cir. 2008).

In response to the First Motion for Preliminary Injunction, ECF No. 59, Defendants argued that Plaintiffs' original proposed injunction lacked the specificity required by Rule 65, and that the method of providing adequate private-duty nursing hours to Plaintiffs "in the face of a widely acknowledged shortage of suitably skilled nurses" is not at all obvious. ECF No. 85 at 5. Defendants contended that, as written, the original proposed injunction

> essentially order[ed] [] HSD to solve a complex problem of labor supply and demand, and medical economics, without providing any concrete instructions for

> accomplishing the task . . . [and] without considering the impact of such a mandate on [] [their] other obligations . . . or whether compliance with the injunction is even possible.

*Id.* at 6. At that time, the Court agreed. ECF No. 136 at 4. Despite the passage of months, however, the answers to various essential questions in this case remain mysterious—whether traveling nurses could solve Plaintiffs' shortfalls or not, the feasibility of attracting nurses from out of state, and why Plaintiffs' parents are periodically able to solve the staffing problem themselves while Defendants are not. *See*, *e.g.*, ECF No. 150-2 at 2–3.

Plaintiffs maintain that the new proposed injunction is not too vague under Rule 65. ECF No. 150 at 22. They argue that in prior cases, including the desegregation case discussed in the prior order, courts have given significant leeway where the information needed to make the order specific in form is known only to the party to be enjoined. *Id.* at 22–23 (citing *Keyes*, 895 F.2d at 669–70). Upon reflection, the Court agrees.

Given the information asymmetry involved in the current case, as well as Defendants' expertise in administration of the New Mexico Medicaid program, the Court finds a flexible preliminary injunction to be both permissible and appropriate in this case. *See also A. H. R. v. Washington State Health Care Auth.*, 469 F. Supp. 3d 1018, 1050 (W.D. Wash. 2016) (ordering defendants to "take all actions within their power necessary for Plaintiffs to receive" their authorized PDN hours); *Norwood,* 838 F.3d at 843 (affirming injunction ordering defendants to "take immediate and affirmative steps to arrange directly or through referral to appropriate agencies, organizations, or individuals, corrective treatment of in-home shift nursing services to Plaintiffs[.]"); *Indep. Living Res. v. Ore . Arena Corp.*, 1 F. Supp. 2d 1159, 1173 n. 16 (D. Or. 1998) (leaving "logistical matters" concerning the implementation "in the capable hands of the

[defendants]"); ECF No. 85 at 21. The Tenth Circuit has found vague language permissible in the injunctive context permissible before, stating in the very same desegregation case:

> [The injunction] is a commendable attempt to give the board more freedom to act within the confines of the law. We recognize the difficulty in drafting an injunction that will allow the district maximum latitude in formulating policies, while at the same time making the injunction sufficiently specific. *The degree of specificity necessary may be determined in light of the difficult subject matter*.

*Keyes*, 895 F.2d at 669 (emphasis added).

Additionally, here, the Court has modified the proposed language to include examples of steps that may show compliance (negotiation with MCO partners, attempts to attract nurses from out of state, increased monitoring of shortfalls), as well as results that may show compliance (increased average number of monthly PDN hours actually provided to Plaintiffs). The Court believes that its modified injunction, as written, does not fall amiss under the Rule, as it "give[s] notice to the defendant of what is prohibited, and [can] guide an appellate court in reviewing the defendant's compliance or noncompliance with the injunction." *Keyes*, 895 F.2d at 668; *see also* Fed. R. Civ. P. 65(d)(1)(C)(requiring that a preliminary injunction "describe in *reasonable* detail— and not by referring to the complaint or other document—the act or acts restrained or required.") (emphasis added); *Shook*, 543 F.3d at 606.

The Court is unwilling to craft relief which may mandate removal of nurses from other equally urgent duty stations, such as other New Mexico children requiring PDN hours, nursing homes or intensive care units. To do so would be to pit equally situated New Mexican patients against each other on the basis of who filed first. The Court is also uneager to usurp Defendants' roles in determining the best use of their limited resources. The Court does not presume to tell Defendants how to perform the day-to-day administration of the state Medicaid program; the Court is merely in the position of being obligated to enforce compliance with the federal Medicaid Act

to ensure provision of services to the neediest beneficiaries of Defendants' programs. The Court has therefore tailored Plaintiffs' proposed preliminary injunction to allow Defendants maximum discretion.

Because the Court's tailoring has made the requested relief narrower, clearer, and thus less burdensome upon Defendants, the Court finds the modifications do not run afoul of Rule 65. *See* Fed. R. Civ. P. 65(a)(1) ("The court may issue a preliminary injunction only on notice *to the adverse party*.") (emphasis added); *see also*, *e.g.*, *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1230 (10th Cir. 2009) (finding defendant "fairly apprised of the likelihood of equitable relief" generally even where it was explicitly requested for the first time in supplemental briefing); *compare Waldrop, et al. v. New Mexico Human Services Dep't et al.*, 1:14-cv-00047 JCH/KBM, ECF No. 11 at 33 (plaintiffs requesting equitable relief in general terms) *with* ECF No. 113 (court sua sponte adding specific steps for compliance).

The Court cautions Defendants, however, that such discretion assumes continued good faith and *additional* efforts to comply with their obligations under the Medicaid Act on top of the laudable steps already taken, ECF No. 176 at 35–36.  In the absence of immediate good faith attempts to comply with their obligations, the Court may appoint a special master to monitor the proceeding on an ongoing basis. Fed. R. Civ. P. 53(a)(1)(C) (The Court may appoint a special master to "address pretrial [] matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district.").

## VIII.   Fees

Plaintiffs ask for fees and costs for the first time in their Reply. ECF No. 192 at 27. Rule 65 does not mandate the awarding of fees, and the Court does not find such an award compelling in this case. The Court will therefore decline to award fees to Plaintiffs for the instant Motion. *See*

*In re: Motor Fuel Temperature Sales Pracs. Litig.*, 872 F.3d 1094, 1113, n.5 (10th Cir. 2017) ("[A]rguments raised for the first time in a reply brief are waived.").

## CONCLUSION

For the foregoing reasons, Plaintiffs' Second Motion for Preliminary Injunction, ECF No. 150, is hereby **GRANTED IN PART**.

The Court therefore **FINDS** that:

1. Plaintiffs have demonstrated a likelihood of success on the merits of their Ninth Cause of Action, which alleges that Defendants violated the Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") provisions, 42 U.S.C. §§ 1396a(A)(10)(A), 1396d(a)(4)(B), and 1396a(a)( 43)( C).

2. Plaintiffs have demonstrated a likelihood of success on the merits of their Sixth and Seventh Causes of Action, which allege that Defendants violated the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

3. Plaintiffs are likely to prevail on their claim that Defendants approved each Plaintiff for EPSDT in-home shift nursing services based on medical necessity and that Plaintiffs are regularly not receiving all such approved services.

4. Without injunctive relief, Plaintiffs lack an adequate remedy at law and face irreparable injury by not receiving medically necessary in-home shift nursing services. The balance of equities and public interest favor Plaintiffs, as the public has an interest in seeing that Defendants provide the care and treatment that Defendants have already determined to be medically necessary.

**IT IS THEREFORE ORDERED THAT:**

A. Defendants shall, in good faith, take additional immediate and affirmative steps to arrange directly or through referral to appropriate agencies, organizations, or individuals, corrective treatment of in-home shift nursing services to Plaintiffs at the level already approved by Defendants, as required by the Medicaid Act, pending final judgment in this action or until further order of the Court.

    1. Such steps may include, but are not limited to, negotiation with Managed Care Organization partners regarding possible solutions, making good faith attempts to attract qualified nurses from other states, increased monitoring of Plaintiffs' weekly shortfalls, or any other administrative or other action which tends to and does actually increase the average number of private duty nursing hours provided to Plaintiffs each month without seriously compromising other programmatic goals.

B. In the case of Plaintiffs who face Private Duty Nursing hours shortages for the duration of this case, Defendants shall take immediate steps to provide notice to the Managed Care Organization for each Plaintiff.

C. In the case of Plaintiffs not facing Private Duty Nursing hours shortages, Defendants shall restore, ensure and not unilaterally withdraw the in-home shift nursing services as of the date of the hearing on Plaintiffs' Motion for Preliminary Injunction on May 18, 2023, in accordance with their Individual Service Plan and their EPSDT Private Duty Nursing budgets.

D. Defendants shall inform the Court and Plaintiffs of the steps taken by Defendants to arrange for in-home shift nursing services to Plaintiffs within 30 days of the entry of this Order.

E.  Within five days of receipt of Defendants' providing the above-described information, Plaintiffs may request a meeting with Defendants to confer regarding the information provided by Defendants; Defendants must offer times to Plaintiffs for the meeting, to occur within ten days of Plaintiffs' request.

F.  Within five days of the meet and confer, Plaintiffs may file a written request for a status hearing before this Court, in order to clarify, provide comment regarding, or challenge the effectiveness of the steps Defendants have taken to arrange for in-home shift nursing services to Plaintiffs.

G.  This Court waives or excuses the filing of any security or bond by Plaintiffs.

H.  This Order shall remain in effect until final judgment in this action or until further order of Court.

**IT IS SO ORDERED.**

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE