IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

M.G., a minor by and through her
mother Christina Garcia,

    Plaintiff,

v.

KARI ARMIJO, in her official
capacity as Secretary for the Human
Services Department, State of
New Mexico, and HUMAN
SERVICES DEPARTMENT,

    Defendants.

Case 1:22-cv-00325-MIS-DLM

**ORDER GRANTING PLAINTIFF'S MOTION TO RECONSIDER DENIAL OF ASSOCIATIONAL STANDING**

THIS MATTER is before the Court on Plaintiff's Motion to Reconsider Denial of Associational Standing, ECF No. 457, filed August 6, 2024. Defendant filed a Response on August 20, 2024, ECF No. 464, to which Plaintiff filed a Reply on August 27, 2024, ECF No. 470. Upon consideration of the Parties' submissions, the record, and the relevant law, the Court will **GRANT** the Motion to Reconsider.

**I.    Background**

On April 28, 2022, Disability Rights New Mexico, Inc. ("DRNM") and three minors, M.G., A.C., and C.V. ("the Named Plaintiffs"),[1] filed a Class Action Complaint against the New Mexico Human Services Department ("HSD") and the Secretary of HSD—who administer the Medicaid

---

[1] On May 15, 2023, Plaintiffs filed a Suggestion of Death stating that A.C. died on May 12, 2023. ECF No. 203. On August 27, 2024, the Court granted Plaintiffs Amended Unopposed Motion to Dismiss Plaintiff C.V. from this action. ECF Nos. 467, 468.

Managed Care program formerly known as Centennial Care 2.0[2]—as well as three Managed Care Organizations ("MCOs").[3]  ECF No. 1 ¶ 1.  The Complaint alleges that the Named Plaintiffs "are medically fragile children who are eligible to receive medically necessary private-duty nursing care" as part of the early and periodic screening, diagnostic, and treatment ("EPSDT") services Defendants are required to provide pursuant to the Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. § 1396d(a)(4)(B).  Id. ¶¶ 1, 58-66.  It alleges that each Named Plaintiff is a "Medically Fragile Waiver participant and Centennial Care 2.0 beneficiary[,]" id. ¶¶ 102, 124, 143, and has been approved for a certain number of hours of private duty nursing ("PDN") services per month by New Mexico's Medicaid program, but Defendants are failing to provide them with adequate hours of PDN services.  Id. ¶¶ 1-2, 13-15.

The Complaint contains the following allegations regarding DRNM's associational standing:

> 16. DRNM is the agency designated by the state of New Mexico as the state's Protection and Advocacy organization, authorized by federal statues [sic] to pursue legal remedies on behalf of persons with disabilities. See Developmental Disabilities Assistance and Bill of Rights Act (the DD Act), 42 U.S.C. §§ 15001 et seq. (2000); the Protection and Advocacy of Individual Rights (the PAIR Act), 29 U.S.C. § 794e (1994); the Protection and Advocacy for Mentally Ill Individuals Act (the PAMII Act), 42 U.S.C. §§ 10801 et seq. (1997).
>
> 17. DRNM has associational standing to assert the legal rights on behalf of all Centennial Care 2.0 beneficiaries under the age of 21 in New Mexico who have been approved for private duty nursing services by Defendants, but are not receiving the nursing services at the level approved by Defendants.
>
> 18. Respecting the causes of action stated in this Complaint, such constituents of DRNM have standing to sue in their own right.

---

[2] On June 13, 2024, Plaintiffs filed a Motion to Amend Class Definition stating that New Mexico's Medicaid program would be renamed "Turquoise Care" on July 1, 2024. ECF No. 445 at 2.  That Motion remains pending.

[3] On October 27, 2022, the Court issued an Order dismissing the only counts asserted against the MCOs and dismissing the MCOs from this case.  ECF No. 77.

> 19. The interests of access to medically necessary services and to be free from discrimination on the basis of disability are germane to DRNM's purpose.

Id. ¶¶ 16-19.

Three claims remain: (1) Plaintiffs' Seventh Cause of Action alleges a violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, id. ¶¶ 236-46; (2) Plaintiffs' Eighth Cause of Action alleges a violation of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116, id. ¶¶ 247-59; and (3) Plaintiffs' Ninth Cause of Action alleges a violation of the EPSDT provisions of the Medicaid Act, 42 U.S.C. § 1396, et seq., id. ¶¶ 260-63.

On June 30, 2023, Plaintiffs filed a Motion for Class Certification and to Recognize Associational Standing of DRNM. ECF No. 235. Plaintiffs' Motion devoted a single sentence to the associational standing issue, to wit:

> Finally, separate, and apart from the question of class certification, Disability Rights New Mexico ("DRNM") requests that this Court recognize its associational standing to bring suit on behalf of all medically fragile children in New Mexico who are not receiving the private duty nursing services for which they are qualified.

Id. at 23 (citing Waldrop v. N.M. Human Servs. Dep't, Civ. No. 14–047 JH/KBM, 2015 WL 13665460, at *5-6 (D.N.M. Mar. 10, 2015) (citing 42 U.S.C. § 15043(a)(2)(i); Lewis v. N.M. Dep't of Health, No. CIV 99-0021 MV/JHG, 2002 WL 35649595, at *7 (D.N.M. Nov. 5, 2002)). Defendants filed a Response opposing Plaintiffs' Motion. ECF No. 261.

In the Reply brief filed in support of their Motion to Recognize Associational Standing, Plaintiffs argued that 42 U.S.C. § 15043 "bestows statutory standing on DRNM to bring suit on behalf of all medically fragile children in New Mexico with developmental disabilities, as the recognized protection and advocacy system for New Mexico[.]" ECF No. 287 at 8 (discussing Waldrop, 2015 WL 13665460, at *5-6).

3

On November 14, 2023, the Court held a hearing on Plaintiffs' Motion. See Tr. of Nov. 14, 2023 Hr'g, ECF No. 372 at 104-20.

On December 12, 2023, the Court issued an Order granting Plaintiffs' Motion for Class Certification and denying Plaintiffs' Motion to Recognize the Associational Standing of DRNM. ECF No. 369 at 39-42. As to the former, the Court certified the following class: "All Centennial Care 2.0 beneficiaries under the age of 21 in New Mexico who have been approved for private duty nursing services by Defendants, but are not receiving the nursing services at the level approved by Defendants due to limited availability of services[.]" Id. at 43. As to latter, the Court agreed with Judge Herrera's conclusion in Waldrop that DRNM has associational standing to sue on behalf of New Mexicans enrolled in the Developmental Disability Waiver, 2015 WL 13665460, at *6, but found that

> the Complaint does not allege—and Plaintiffs have provided no evidence—that any individuals enrolled in the Developmental Disability Waiver have been approved for private duty nursing services by Defendants and are not receiving the nursing services at the level for which they were approved due to limited availability of services. Stated differently, Plaintiffs have not alleged or established that any of DRNM's "members" have suffered an injury in fact. Therefore, Plaintiffs have not established that DRNM's members would have standing to sue in their own right, and DRNM consequently lacks associational standing. HEAL Utah v. PacifiCorp, 375 F. Supp. 3d 1231, 1241-47 (D. Utah 2019) (concluding that environmental organizations lacked associational standing because they failed to establish that one of their members suffered an injury in fact).

Id. at 42.

On August 9, 2024, Plaintiffs filed the instant Motion to Reconsider Denial of Associational Standing.[4] ECF No. 457. Defendants filed a Response on August 20, 2024, ECF No. 464, to which Plaintiffs filed a Reply on August 27, 2024, ECF No. 470.

---

[4] Plaintiffs also filed a Request for Hearing for Consideration of Plaintiffs' Motion to Reconsider Denial of Associational Standing. ECF No. 459. The Court finds that a hearing would not be helpful to resolving the issues raised in the Motion to Reconsider.

## II.     Legal Standard

Federal Rule of Civil Procedure 54(b) provides that an interlocutory order "may be revised at any time before the entry of a" final judgment. Accordingly, "district courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., 495 F.3d 1217, 1225 (10th Cir. 2007). This power is not subject to any particular standard or framework. See Kruskal v. Martinez, 429 F. Supp. 3d 1012, 1024 (D.N.M. 2019) (observing that Rule 54(b) "(i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so, other than that it must do so 'before the entry of judgment[,]'" and further observing that [t]he Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: '[D]istrict courts generally remain free to reconsider their earlier interlocutory orders'") (quoting Been, 495 F.3d at 1225). Rather, orders "short of a final decree" may be reopened at the district judge's discretion. Price v. Philpot, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 12 (1983)).

## III.     Discussion

The Court finds that reconsideration is appropriate because DRNM was not required to allege or prove that any individuals enrolled in the Developmental Disability Waiver have been approved for private duty nursing services by Defendants and are not receiving the nursing services at the level for which they were approved due to limited availability of services. Thus, the Court's conclusion that DRNM lacks associational standing rested on a faulty premise, which the Court endeavors to correct in this Order.

The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Def. of Wildlife, 504 U.S. 555, 560 (1992). As such, "[a]bsent

5

a plaintiff with constitutional standing, federal courts lack jurisdiction." S. Utah Wilderness Alliance v. Palma, 707 F.3d 1143, 1153 (10th Cir. 2013) (citing Summers v. Earth Island Inst., 555 U.S. 488, 192-93 (2009)).  To satisfy Article III's standing requirement, a plaintiff must show:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000).  Standing is generally determined on the allegations contained in the pleadings, Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 115 & n.31 (1979), and is determined as of the time the complaint is filed, Palma, 707 F.3d at 1153.

"Even in the absence of injury to itself, an association may have standing solely as the representative of its members." Warth v. Seldin, 422 U.S. 490, 511 (1975).  The Supreme Court has stated that an association has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977).  The third element is a prudential requirement, not a constitutional one.  United Food & Com. Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 555-56 (1996).

As to the first element of associational standing espoused in Hunt, the Court finds that at least one of DRNM's constituents—named Plaintiff, A.C.[5]—would have standing to sue in her

---

[5] Although A.C. has died since the filing of the Complaint, see supra Note 1, standing is determined at the time the Complaint is filed, S. Utah Wilderness Alliance v. Palma, 707 F.3d 1143, 1153 (10th Cir. 2013).

own right. See Warth, 422 U.S. at 511 ("The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit."); Utah Ass'n of Cntys. v. Bush, 455 F.3d 1094, 1099 (10th Cir. 2006) ("Although this quotation refers to 'members,' plural, if even one member of the association would have had standing to sue in his or her own right, that is sufficient.").

Pursuant to the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15001, et seq., in order for a State to receive federal funding for services for individuals with developmental disabilities,

> **(1)** the State shall have in effect a system to protect and advocate the rights of individuals with developmental disabilities;
>
> **(2)** such system shall—
>
> **(A)** have the authority to—
>
>> **(i)** pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals within the State who are or who may be eligible for treatment, services, or habilitation, or who are being considered for a change in living arrangements, with particular attention to members of ethnic and racial minority groups[.]

42 U.S.C. § 15043(a). Here, it is undisputed that DRNM is the official protection and advocacy system for individuals with developmental disabilities in New Mexico under this statute.[6] See ECF No. 1. ¶ 101, ECF No. 235 at 23; ECF No. 261 at 11-12; ECF No. 287 at 7-12. As such, DRNM is statutorily authorized to sue a state agency on behalf of individuals with developmental

---

[6] The Complaint alleges, and the instant Motion argues, that DRNM is the protection and advocacy organization designated to pursue remedies on behalf of persons with all disabilities in New Mexico under the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15001, et seq., the Protection and Advocacy of Individual Rights Act, 29 U.S.C. § 794e, and the Protection and Advocacy for Mentally Ill Individuals Act ("PAMII Act"), 42 U.S.C. § 10801, et seq. See ECF No. 1 ¶ 16; ECF No. 457 at 12.

...

disabilities in New Mexico. 42 U.S.C. § 15044(b)(1). "Developmental disability" is defined as follows:

> **(A) In general**
>
> The term "developmental disability" means a severe, chronic disability of an individual that--
> **(i)** is attributable to a mental or physical impairment or combination of mental and physical impairments;
> **(ii)** is manifested before the individual attains age 22;
> **(iii)** is likely to continue indefinitely;
> **(iv)** results in substantial functional limitations in 3 or more of the following areas of major life activity:
> **(I)** Self-care.
> **(II)** Receptive and expressive language.
> **(III)** Learning.
> **(IV)** Mobility.
> **(V)** Self-direction.
> **(VI)** Capacity for independent living.
> **(VII)** Economic self-sufficiency; and
> **(v)** reflects the individual's need for a combination and sequence of special, interdisciplinary, or generic services, individualized supports, or other forms of assistance that are of lifelong or extended duration and are individually planned and coordinated.
>
> **(B) Infants and young children**
>
> An individual from birth to age 9, inclusive, who has a substantial developmental delay or specific congenital or acquired condition, may be considered to have a developmental disability without meeting 3 or more of the criteria described in clauses (i) through (v) of subparagraph (A) if the individual, without services and supports, has a high probability of meeting those criteria later in life.

42 U.S.C. § 15002(8).

The Complaint alleges that "Plaintiff A.C. is a nine-year-old girl diagnosed with Rett Syndrome, epilepsy, and global developmental delays." ECF No. 1 ¶ 101. She "is a Medically Fragile Waiver participant and Centennial Care 2.0 beneficiary . . . ." Id. ¶ 102. "She is non-verbal and requires maximum assistance in basic living functions such as feeding, walking, toileting, and bathing. She also requires regular breathing assessments and monitoring during night-waking

episodes, which are a symptoms [sic] of Rett Syndrome." Id. ¶ 103. "She experiences seizures every day, often requiring oxygen assistance and an emergency intervention plan for seizure activity lasting longer than 5 minutes." Id. ¶ 104. She "also experiences 'Rett Episodes' during which she loses all motor control for up to one minute at a time. She will have spastic movements of all muscles in her body and requires assistance to ensure safety and to regain bodily control." Id. ¶ 105. She "is economically dependent upon the income of her parents." Id. ¶ 114. At the time the Complaint was filed, A.C. was approved for PDN service hours but was not receiving any. Id. ¶¶ 106, 112.

These allegations are supported by a Declaration A.C.'s mother filed further describing A.C.'s medical conditions and their symptoms.[7] ECF No. 59-4 ¶¶ 3-14. For example, she explains that "Rett Syndrome is a random genetic mutation that effects [sic] the neurological system in only 1 out of 10,000 females." Id. ¶ 3. Additionally, A.C. "has been clinically diagnosed with Congenital Hypotonia which means she does not have the muscle tone or strength needed to hold her own body weight." Id. ¶ 4. "Due to her condition, A.C. also has Motor Apraxia (her body does not do what her brain tells it to do). This affects all functions of her physical body including, among other things, walking, the ability to hold her own body weight, the ability to swallow or digest food, and the ability to breathe." Id. ¶ 6. She has also "lost all functional use of her hands . . . ." Id. ¶ 7. A.C. requires "full assistance for all activities of daily living such as eating, bathing, toileting, and playing[,]" and "also requires assistance with daily medical needs . . . ." Id. ¶ 11.

---

[7] Although A.C.'s mother's Declaration was executed on September 27, 2022, ECF No. 59-4 at 7—approximately five months after the Complaint was filed, ECF No. 1—it appears that the medical conditions and symptoms described in the Declaration existed at the time the Complaint was filed as they are also described in the Complaint. Additionally, the Declaration states that A.C. was diagnosed with Rett Syndrome on July 7, 2017, ECF No. 59-4 ¶ 3; describes A.C.'s seizure disorder going back to the fall of 2020, id. ¶ 9; and represents that A.C. was assessed to require 40 hours of private duty nursing services per week as of March 2020, id. ¶ 22.

The Declaration confirms that A.C. "has typically not received any hours of nursing services[,]" even though she was assessed to require 40 hours of PDN services per week. Id. ¶¶ 22-23.

The Court finds that the Complaint plausibly alleges, and the record supports, that A.C. is an individual with a developmental disability, as defined in 42 U.S.C. § 15002(8), who would have standing to sue Defendants in her own right. Indeed, Defendant has never challenged the named Plaintiffs' standing to sue.

As to the second element of associational standing espoused in Hunt, the Court finds that the interests DRNM seeks to protect are germane to the organization's purpose. "As the designated protection and advocacy system for the developmentally disabled citizens of New Mexico, DR[N]M possesses the authority to 'pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such [developmentally disabled] individuals within the State who are or who may be eligible for treatment, services, or habilitation . . .'" Waldrop, 2015 WL 13665460, at *5 (quoting 42 U.S.C. § 15044(a)(1)). In this case, DRNM is pursuing legal remedies to ensure the rights of developmentally disabled individuals within New Mexico who are or may be eligible for PDN service hours. See ECF No. 1 ¶¶ 16-17. This is germane to DRNM's purpose. See Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corr., 642 F. Supp. 2d 872, 879 (S.D. Ind. 2009) ("The interests that IPAS seeks to protect are not merely germane to the agency's purpose, they are its reason for existence.").

Finally, the Court finds that DRNM is not required to satisfy the third element of associational standing espoused in Hunt. As the Ninth Circuit explained in a case brought by the Oregon Advocacy Center ("OAC")—the designated protection and advocacy organization

representing the rights of individuals with disabilities in Oregon—on behalf of mentally incapacitated criminal defendants:

> Although . . . the Constitution constrains Congress' ability to confer standing, Congress can confer standing where the only obstacles are "judicially fashioned and prudentially imposed." United Food, 517 U.S. at 551, 558, 116 S.Ct. 1529. The third prong of Hunt, which requires that associations have standing only when "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit," 432 U.S. at 343, 97 S.Ct. 2434, is one such prudential, as opposed to constitutional, requirement of standing. United Food, 517 U.S. at 557, 116 S.Ct. 1529 ("[T]he third prong of the associational standing test is best seen as focusing on these matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution."); see also Cent. Delta Water Agency v. United States, 306 F.3d 938, 951 n.9 (9th Cir. 2002) (noting that unlike the first two Hunt factors, "the third factor is 'merely prudential,' and designed to promote efficiency in adjudication"). As discussed above, Congress clearly intended PAMII to confer standing on organizations such as OAC to litigate on behalf of those suffering from mental illness. In United Food, the Supreme Court concluded: "Because Congress authorized the union to sue for its members' damages, and because the only impediment to that suit is a general limitation, judicially fashioned and prudentially imposed, there is no question that Congress may abrogate the impediment." 517 U.S. at 558, 116 S.Ct. 1529. Here, we hold that because Congress authorized advocacy and protection organizations like OAC to sue on behalf of those suffering from mental illness, and because the only impediment to such a suit is a prudential one, Congress may abrogate the impediment.
>
> The question, then, is whether Congress did abrogate the prudential impediment to OAC's standing. In United Food, the Court held that Congress had "without doubt" abrogated the third prong of the Hunt test by specifically authorizing the union to sue for its members' damages. Id. at 548–49, 558, 116 S.Ct. 1529. In the statute at issue in United Food, Congress explicitly authorized unions to sue on behalf of their members when an employer fails to give workers 60 days' notice before a plant closing or mass layoff as the statute required. Id. at 549, 116 S.Ct. 1529. PAMII, like the WARN Act at issue in United Food, explicitly authorizes organizations such as OAC to bring suit on behalf of their constituents, who include criminal defendants declared unfit to proceed. PAMII provides that "[a] system established in a State under . . . section 10803 of this title to protect and advocate the rights of individuals with mental illness shall . . . have the authority to . . . pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." 42 U.S.C. § 10805(a)(1)(B). We hold that in light of the role Congress assigned by statute to advocacy organizations such as OAC, Congress abrogated the third prong of the Hunt test.

11

Or. Advoc. Ctr. v. Mink, 322 F.3d 1101, 1113 (9th Cir. 2003). As such, the Ninth Circuit found that it "need not reach the question whether OAC's claim would otherwise require the participation of individual incapacitated criminal defendants." Id. at 1113 n.6.

The Court agrees with the Ninth Circuit's analysis and adopts it. See Dunn v. Dunn, 219 F. Supp. 3d 1163, 1171 (M.D. Ala. 2016) (observing that "[n]umerous other district courts have reached the same conclusion" as the Ninth Circuit in Mink) (citing Ind. Prot. & Advoc. Servs. Comm'n, 642 F. Supp. 2d at 878; Joseph S. v. Hogan, 561 F. Supp. 2d 280, 307 (E.D.N.Y. 2008); N.J. Prot. & Advoc., Inc. v. Davy, No. Civ. 05–1784(SRC), 2005 WL 2416962, at *2 (D.N.J. Sept. 30, 2005); Univ. Legal Servs., Inc. v. St. Elizabeths Hosp., No. Civ. 105CV00585TFH, 2005 WL 3275915, at *4 (D.D.C. July 22, 2005); Unzueta v. Schalansky, No. 99–4162–RDR, 2002 WL 1334854, at *3 (D. Kan. May 23, 2002); Pa. Prot. & Advoc., Inc. v. Houston, 136 F. Supp. 2d 353, 364–65 (E.D. Pa. 2001); Risinger v. Concannon, 117 F. Supp. 2d 61, 68–70 (D. Me. 2000)). Because DRNM is the designated protection and advocacy organization authorized to pursue legal remedies on behalf of individuals with developmental disabilities under the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. §§ 15043-15044, DRNM need not satisfy Hunt's third prong.[8] Mink, 322 F.3d at 1113 n.6.

For these reasons, the Court finds that DRNM has satisfied the criteria for associational standing.

---

[8] "This is not to say that the claims [DRNM] has brought could not satisfy Hunt's third prong—that they do not required the participation of individual constituents in the litigation." Dunn, 219 F. Supp. 3d at 1172. In this regard, Defendants argue that "[d]emonstrating that each member of the class was qualified for and is not receiving in home skilled care, including private duty nursing services, requires each individual to participate to determine his or her own right to access the services and barriers created by HSD to those services." ECF No. 261 at 17. However, in its Order granting class certification the Court rejected those same arguments. See ECF No. 369 at 26-31. And other courts have persuasively rejected similar arguments in the associational standing context. See Dunn, 219 F. Supp. 3d at 1171-72; Joseph S., 561 F. Supp. 2d at 307-08.

## IV. Conclusion

Therefore, it is **HEREBY ORDERED** that:

1. Plaintiffs' Motion to Reconsider Denial of Associational Standing, ECF No. 457, is **GRANTED**;

2. Plaintiffs' Motion to Recognize Associational Standing by Disability Rights New Mexico, ECF No. 235, is **GRANTED**; and

3. Plaintiffs' Request for Hearing for Consideration of Plaintiffs' Motion to Reconsider Denial of Associational Standing, ECF No. 459, is **DENIED AS MOOT**.

_____
**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE